STATE of Wisconsin, Plaintiff-Respondent,

v.

Clifford D. BVOCIK, Defendant-Appellant.

Court of Appeals

*No. 2009AP140–CR. Oral argument December 15, 2009.
—Decided February 3, 2010.*

2010 WI App 49

(Also reported in 781 N.W.2d 719.)

352

On behalf of the defendant-appellant, the cause was submitted on the briefs and oral argument by *James C. Murray* of *Murray Law Office*, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Sally L. Wellman*, assistant attorney general, and *J.B. Van Hollen*, attorney general. There was oral argument by Sally L. Wellman.

Before Brown, C.J., Neubauer, P.J., and Anderson, J.

¶ 1. BROWN, C.J. In *State v. Weiss*, 2008 WI App 72, ¶¶ 15–17, 312 Wis. 2d 382, 752 N.W.2d 372, we held that when a prosecutor's closing argument asks the jury to draw an inference that the prosecutor knows or should know is not true, it is improper argument which may require reversal. This is a *Weiss*-type case. The State alleged that Clifford D. Bvocik used a computer to facilitate a meeting with what he thought to be an underage girl in order to have sex, contrary to WIS. STAT. § 948.075(1) (2007–08).[1] There never was an underage girl; she was a twenty-eight-year-old woman pretending to be fourteen. Whether she was twenty-eight or fourteen should not have mattered so long as Bvocik thought she was fourteen and traveled to Manitowoc to meet a person whom he believed to be a fourteen-year-old girl. But the prosecutor, in closing argument, made a comment from which the jury could infer that the woman *was* a fourteen-year-old girl and that Bvocik

---

[1] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

■■■■■■■■■■■■■

had reason to believe that. While doing so, the prosecutor knew the real truth—she was twenty-eight, not fourteen—a fact which the jury was never allowed to hear. We know this affected the jury because it wrote a question to the court, during deliberations, wanting to know the correct age of the "girl" in question. As in *Weiss*, the prosecutor's statement in closing argument prevented the real issue from being tried and we reverse and remand in the interest of justice.

## BACKGROUND

¶ 2.   This all began when the twenty-eight-year-old female, who had a free trial membership in a website devoted to BDSM[2] for consenting adults, contacted Bvocik by email through this site. Bvocik was an active, paid member of the site. Members fill out a "profile" indicating their specific sexual interests and experience. These profiles are available for other members to peruse. Both the female and Bvocik had a profile, and the female wrote that she had looked up his profile. Bvocik, in turn, looked up the female's profile. The profile listed her birth date as February 14, 1977 (making her twenty-eight years old at the time). Among many other things, she had indicated her interest and intermediate experience in "age-play" (appearing to be either older or younger than actual). She also indicated that she had experience with sex toys, was a heavy smoker, and was into receiving BDSM. An email relationship evolved. Without getting into specifics, she confirmed her interest in receiving BDSM and he wrote about his interest in giving this type of sex.

---

[2] This is an acronym for bondage, discipline, sadism and masochism.

¶ 3.   After reading the email correspondence in the record, it is apparent that Bvocik regularly and relentlessly suggested that the two meet personally to have this type of sex. For her part, the female was not unresponsive to that idea. But, at some point, for reasons that were not forthcoming in the testimony (mainly because this female never testified), the female wrote Bvocik saying she was underage—asking him to guess her real age. Eventually, the female said she was, in all "honesty," only fourteen. While Bvocik questioned whether she was really underage, he continued to suggest a meeting. Eventually, the female went to the Manitowoc police and told police that Bvocik wanted to meet with her even though she had informed him that she was underage. The police took it from there and appropriated the female's online persona for further communications with Bvocik. Subsequently a meeting place, date and time were agreed upon, and Bvocik went to Manitowoc for the meeting. The police were there instead, and he was arrested.

¶ 4.   Whether Bvocik actually believed or had reason to believe that he was going to Manitowoc to meet an underage girl, as opposed to a twenty-eight-year-old woman, was what the jury trial was supposed to be about. Bvocik's theory of defense was that he could not reasonably have known that the female he was communicating with might be only fourteen years old. His main evidence was the profile that the female had provided, giving her birth date as February 14, 1977, which would have made her twenty-eight years old at the time of the email correspondence. He further contended that the language and tone of the female's email correspondence did nothing to dissuade him from believing that he was dealing with a twenty-eight-year-old woman, even after she claimed to be only fourteen.

355

After all, he contended, the profile of the female said that she was into age-play. He accented her email correspondence where the woman recounted her vast experience in BDSM, her knowledge of sex toys commonly used in the BDSM culture, and her graphic depictions of what she wanted him to do to her. Bvocik's assertion was that this was not the language and knowledge of a fourteen-year-old girl, but rather of an adult.

¶ 5. The State's theory was that Bvocik had reason to believe that he was communicating with a fourteen-year-old and pursued a meeting nevertheless. The State used the emails that were in evidence to hammer home the point that the female (and the officers thereafter) repeatedly told him she was only fourteen and had made statements to him like the following:   "I have been thinking about your hard cock in my tight little 14 year old ass." Rather than stay away, Bvocik charged ahead and wanted to meet. The State discounted the graphic language used by the female by suggesting that fourteen-year-olds are just as capable of using this language as adults. The State noted that it was not required to prove that Bvocik knew, for certain, that the female involved in the email communications was fourteen. All the State had to prove under WIS. STAT. § 948.075 was that Bvocik "ha[d] reason to believe" she was under sixteen. Finally, the State had in its possession an inculpatory statement made by Bvocik to police after he was arrested in which, after telling police that he thought there was a 70% chance that the female he was supposed to meet was twenty-eight and a 30% chance that she was fourteen, after much hemming-and-hawing and equivocation, he said:   "I hate to say it, I guess yes" to whether he came

to Manitowoc to meet an underage girl. (More on this statement is found at footnote 5 of our opinion.)

¶ 6. As we indicated above, the centerpiece of Bvocik's defense was the female's profile showing a birth date making her twenty-eight and interested in age-play. During rebuttal closing argument, the prosecutor decided to attack the defense in the following manner. We cite the record in pertinent part, italicizing certain portions for emphasis:

> [PROSECUTOR]: Now, there's a couple things I missed. And it didn't even dawn on me until closing arguments. It says right here, she was born February 14, 1977. Whoa, *if I am going to make up a date,* on a find a man site, for sex, February 14th is the first date I come up with. You know, there's these kind of clues. And then he said.
>
> [DEFENSE ATTORNEY]: Your honor, if I may address—approach the bench?
>
> THE COURT: Okay.
>
> (Side bar taken) [Unrecorded]
>
> [PROSECUTOR]: ... [W]hether that's a true date *or not,* if you are looking to see whether someone is being honest with you and it's a site to find a partner, and now they say, I'm not really [who] I said I was, *doesn't February 14th sound a little more suspicious than another date.*
>
> . . . .
>
> And, you know, stuff like, kids can't get sex toys. Okay. How many of you got booze when you couldn't get booze? ... If a kid wants something, a kid gets something.

¶ 7. Following closing arguments and after being instructed, the jury retired to deliberate. In the midst of deliberations, the jury asked the trial court the follow-

ing written question: "How old was the girl who actually initiated and came to the police?"

¶ 8.   The question spawned an interesting discussion between counsel and the trial court. Notably, as we shall see, the trial court itself was confused about the female's true age. The discussion, in pertinent part, is as follows:

> THE COURT:   ... I should put on the record that during the State's rebuttal argument, the Court conducted a side bar conference at the request of defense counsel, who pointed out that apparently the actual birthday of the young lady who originally was on the web site that led to the Complaint to the police . . . was February 14 of a different year, but that her actual date of birth was February 14th; is that correct?
>
> [PROSECUTOR]:   No, no, I think, actually, if we looked at the report, I think the date of birth she gave was probably right, wasn't it?
>
> [DEFENSE ATTORNEY]:   Yes. The point I was making is, [the prosecutor], in his closing, began to indicate that this was a fictitious birth date. And then I pointed out that it was actually her real birth date and he did follow up with, whether it's her birthday or not.
>
> [PROSECUTOR]:   And my point was, I wasn't trying to say it was fictitious, it's just, if you're going to come up with a date, that would be it. And so the problem it became was, we never got into evidence any reference to her birth date . . . .
>
> THE COURT:   All right. So her—the profile on the . . . website had the correct date, February 14th, but the wrong year?
>
> [PROSECUTOR]:   No.
>
> [DEFENSE ATTORNEY]:   Everything was correct. Right year, right date, everything.

358

THE COURT: How did she represent herself as being 28 years old if the date of birth she put on the website showed she was only 14?

[PROSECUTOR]: No, no, no. She said she was 28 on the website.

. . . .

THE COURT: .... Just for my own informa-
tion ... what was the age of the actual person that was on this website that brought the Complaint to the police?

[BOTH COUNSEL: 28.]

THE COURT: ... [S]o ... you are telling me ... she told the defendant she was 14 because she thought what?

[PROSECUTOR]: ... [We] *didn't go into all this on the record,* but she decides at some point, at least what she represents to Jacobs is, she was a little creeped out, and she thought she was in over her head or something. And so she goes and gives a young age, thinking that this person will wander off.

THE COURT: Okay.

[PROSECUTOR]: And then the person didn't wander off, and that bothered her, so she went to the police and said, I told this guy I was 14, or I told him I was underage and he still continued to pursue me.

THE COURT: All right ... I somewhat under-
stand why the jury is curious . . . .

. . . .

I assume [the jury] believed that there was a 14 year old, or some underage girl who came to the police, although ... I don't believe any information about the reporter's age, actual age, was placed in the record.

359

[PROSECUTOR]: I don't believe there is . . . .

(Emphasis added.) Thereafter, with approval of both counsel, the jury was instructed that the court was not allowed to comment on the evidence introduced during the trial. The jury eventually returned a verdict of guilty and the court denied Bvocik's motion for postconviction relief. This appeal followed.

## DISCUSSION

■

¶ 9.  As we have indicated above, one of the facts Bvocik relied upon to argue that he had no reason to believe the emails were from a fourteen-year-old girl was the birth date listed in the female's profile making her twenty-eight. Taking aim at this reliance in rebuttal closing argument, the prosecutor suggested to the jury that the profile listing the woman as being twenty-eight and having been born on February 14, 1977, was obviously suspicious, *i.e.*, it was apparent that it was false. The prosecutor was undoubtedly suggesting that any reasonable male in Bvocik's shoes would understand that the profile was possibly false because the listed date, February 14, was Valentine's Day.

¶ 10.  In truth and in fact, the prosecutor knew at the time that the birth date in the profile was absolutely true. Yet, he suggested to the jury that it might be false. Even after the defense counsel called him on it in an unrecorded side-bar, the prosecutor still would not let it go. When the prosecutor resumed his rebuttal, he suggested that the date, whether true *or not,* should have put Bvocik on notice. Thus, what the prosecutor did here was to suggest that the birth date could be untrue when he knew it was true.

¶ 11.  We are convinced that what the prosecutor did in this case is similar to what the assistant district attorney did in *Weiss*. There, the assistant district attorney told the jury during closing arguments that the defendant had never denied committing the crime until he was on the witness stand testifying in his own defense, implying that his eleventh-hour denial was not credible because he had not protested his innocence from the start. *Weiss*, 312 Wis. 2d 382, ¶¶ 5, 7. But the prosecutor knew when she made the statement that the defendant had denied his guilt to police officers from the very beginning, on two separate occasions. *Id.*, ¶ 9. We wrote:  "[The prosecutor] knew better. She had the two police reports saying otherwise . . . . Prosecutors may not ask jurors to draw inferences that they know or should know are not true." *Id.*, ¶ 15. Although trial counsel did not object to this statement, after reviewing the complete record, we nonetheless reversed in the interest of justice. *Id.*, ¶¶ 16–17. We did so after noting that the misstatements came in closing arguments where Weiss did not have the opportunity to introduce the contrary police reports in evidence as rebuttal. *Id.*, ¶ 16. We further commented that counsel was likely surprised since the State acknowledged during pretrial proceedings that, because defendant had "obviously denied" committing the assault, the State felt no need to introduce his written statements saying so. *Id*. We held that the real issue had not been fully tried. *See id.*, ¶ 17.

¶ 12.  In this case, too, the prosecutor knew the truth—the female was twenty-eight and the birth date provided in the profile was therefore correct. Yet, knowing the profile was true, he asked the jury to accept the inference that the profile might well be false, and, by extension, that the female who was engaged in corre-

spondence with Bvocik was an underage girl, not a twenty-eight-year-old woman. By asking the jury to draw this inference, the prosecutor was thus more able to argue that the profile was not credible and Bvocik should not have relied on it. And, if the jury accepted the premise that the profile was not reliable, then it could reject Bvocik's defense.[3]

■

¶ 13.   Whenever there is a question of whether prosecutorial misconduct has so infected the jury that a new trial must be had, we read the entire trial transcript to determine whether a fair trial was conducted nonetheless. We did that in *Weiss* and we have done so here. But what we found here only convinces us that the prosecutor's action had a great effect on the jury. First, and foremost, the jury's written question to the court convinces us that the prosecutor's remark had the intended effect. The jury wanted to know the correct age of the "girl" in question. It wanted confirmation that the profile was false. Second, the jury never heard any evidence that the woman in question was really twenty-eight. Third, what the jury *did* hear was a police officer testifying that a woman had come to the police department to complain about a person on the Internet who was trying to have sex with her, even though "she told

---

[3] We note that there was never an objection from counsel. To be sure, counsel did immediately raise the issue during a sidebar but there was no formal objection and no motion for mistrial was made. Nonetheless, counsel could not have suspected that the prosecutor would make the female's age an issue. Just like the counsel in *State v. Weiss*, 2008 WI App 72, 312 Wis. 2d 382, 752 N.W.2d 372, Bvocik's counsel was likely surprised by the sudden turn of events during the prosecutor's closing rebuttal argument and it was too late to place countering evidence in the record.

this person that she was 14 years old." Then, when the prosecutor asked the officer where he met with the woman, the officer, who identified himself as the police liaison for the public high school, replied that she "was brought up to my office at Lincoln High School and I went on that [website] on the high school computer . . . . And she gave me her password [and] her . . . user name." That the female was brought to the public high school for a meeting between the police officer simply added to the mystery of the female's age. It would not be outside the realm of speculation for a jury to believe it to be perfectly reasonable that an underage girl would be brought to the local high school's police liaison officer, one with experience talking to juveniles. Fourth, the email correspondence between the female and Bvocik, placed into the record and read to the jury, was also ambiguous about her age because, even though her profile listed her as being twenty-eight, a heavy smoker, amply experienced in BDSM activities, and into age-play, she (and the police officer portraying her thereafter) eventually claimed that in all "honesty" she was only fourteen.

¶ 14. So, we can understand why the jury believed there was a question about the female's age. Had there been concrete evidence by the State of the female's correct age, then we could probably conclude that the real issue had been tried. And then, had the prosecutor suggested that, despite the true age listed on the profile, the email correspondence between the two showed how Bvocik had reason to believe that the female on the other end was nonetheless only fourteen, we would not have been troubled. However, the State, by its own admission, told the trial court during the discussion following the question posed by the jury that "we didn't go into all this on the record."

363

¶ 15. We are satisfied that, while it should not have mattered, the State took a fact that it knew to be true—the female's correct age—and asked the jury to infer that the profile showing her age was quite possibly false. This, in turn, allowed the jury the freedom to entertain a factual conclusion that should never have been part of the jury's calculus in deciding whether the statute was violated—that there was a real "underage victim" in this case, that Bvocik had reason to believe this to be so and reason, therefore, to disbelieve the profile when he traveled to Manitowoc to meet her.[4] The prosecutor's suggested inference muddied up the true issue in this case—whether Bvocik used the computer for the purposes of facilitating a meeting with who he thought to be an underage girl. The real issue was not tried. We reverse and remand for further proceedings not inconsistent with this opinion.[5]

---

[4] We are also troubled by the prosecutor's statement that his role is to "find the truth" while that is "not defense counsels' role in any way, shape, or form . . . no where . . . does it say that it is his role to seek out that truth if that truth may be harmful to his client." This statement is directly contrary to the teaching of our supreme court in *State v. Mayo*, 2007 WI 78, ¶ 43, 301 Wis. 2d 642, 734 N.W.2d 115. There, the prosecutor informed the jury that the defense counsel's role was to "get his client off the hook" and "not to see justice done but to see that his client was acquitted," whereas, her job was to look at the facts and determine if someone was guilty. *Id.*, ¶¶ 16, 42. Our supreme court held that this kind of role defining argument is improper and demeans the judicial process. *Id.*, ¶ 42. We find this especially disconcerting here because the prosecutor went on to suggest to the jury that the profile might be false when he knew it was true.

[5] We do not address or decide the other issues raised by Bvocik in this appeal. Cases should be decided on their narrowest grounds. *State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d

*By the Court.*—Judgment and order reversed and cause remanded with directions.

514 (Ct. App. 1989). However, for transparency's sake, we note that one other issue received extensive consideration by this court at oral argument in addition to the issue upon which this opinion rests. That issue was whether counsel rendered ineffective assistance by failing to move to suppress statements that were made by Bvocik preparatory to a Voice Stress Analysis test (VSAT). The law, as pronounced in *State v. Davis*, 2008 WI 71, 310 Wis. 2d 583, 751 N.W.2d 332, is that VSAT's are not admissible in court and that when a statement is so closely associated with the voice stress analysis that the analysis and the statement are one event rather than two totally discrete events, the statement must be suppressed. *See id.*, ¶¶ 20–21. Here, a Wisconsin Department of Justice official told Bvocik that he was present at the request of Manitowoc police to perform a VSAT, that Bvocik did not have to submit to the test and that anything he said could not be used against him in court. He then told Bvocik that he was going to ask some "pre-test" questions in preparation for the VSAT. It was during this pre-test that Bvocik made what can be termed as an inculpatory statement. While we do not discuss this in the body of the opinion, we note that this is not because we believe the issue to be of no merit.