STATE of Wisconsin, Plaintiff-Respondent,

v.

Alan Keith BURNS,
Defendant-Appellant-Petitioner

Supreme Court

*No. 2009AP118-CR. Oral argument November 3, 2010.
—Decided April 26, 2011.*

2011 WI 22

(Also reported in 798 N.W.2d 166.)

For the defendant-appellant-petitioner, there were briefs and oral argument by *David R. Karpe* and *Karpe Law Office,* Madison.

For the plaintiff-respondent, there was a brief and oral argument by *Daniel J. O'Brien,* assistant attorney general, with whom on the brief was *J.B. Van Hollen.*

¶ 1. PATIENCE DRAKE ROGGENSACK, J. We review an unpublished opinion of the court of appeals[1] affirming the circuit court's order[2] denying Alan Burns' motion for a new trial in the interest of justice. The

---

[1] *State v. Burns,* No. 2009AP118–CR, unpublished slip op. (Wis. Ct. App. Jan. 28, 2010).

[2] The Honorable Edward E. Leineweber of Richland County presided.

issue presented in this case is whether the real controversy, that is, whether S.B. lied when she alleged Burns sexually assaulted her, was fully tried. Burns argues S.B.'s truthfulness was not fully tried and he, therefore, is entitled to a new trial in the interest of justice. Specifically, Burns contends that S.B.'s misleading testimony regarding her virginity, the circuit court order that forbid him from cross-examining the expert witness about previous sexual assaults alleged by S.B., and statements made during the prosecutor's closing argument, all prevented the real controversy from being fully tried. After thorough review of the record, we conclude that the real controversy was fully tried. Therefore, a new trial in the interest of justice is not warranted. Accordingly, we affirm the decision of the court of appeals.

## I. BACKGROUND

¶ 2. The facts of this case are both unfortunate and disturbing. They involve the repeated sexual assaults of S.B., a minor, by both her maternal grandfather, Keith Burns (the grandfather) and her maternal uncle, Alan Burns (Burns). The facts are drawn from the record, including the trial transcripts of both Burns' and the grandfather's trials. For the most part, they are presented in chronological order. Additional facts are discussed where applicable during our discussion in section II below.

### A. Charges against Burns and the Grandfather

¶ 3. In May of 2005, Burns was charged with 12 counts of sexual assault of a child under 16 years of age, due to conduct with his niece, S.B., when she was 14 years old. The incidents were alleged to have occurred in July and December of 2004 when S.B. was visiting

735

her maternal grandparents in Wisconsin.[3] Burns was living with his parents, S.B.'s grandparents, at this time. Most assaults were alleged to have taken place in an upstairs bedroom of S.B.'s grandparent's house while her grandparents were downstairs. Eleven of the counts were based on sexual contact, and one was based on sexual intercourse.

¶ 4. In September of 2005, four months after the complaint was filed against Burns, the State of Wisconsin filed a complaint against the grandfather. The complaint alleged that he had sexually assaulted S.B. numerous times since 1990, when S.B. was approximately four years old, including sexual intercourse starting when S.B. was approximately eight years old.[4]

### B. Burns' Pre-Trial Motion

¶ 5. Burns filed a pre-trial motion to admit evidence of S.B.'s allegations against her grandfather. He claimed they were relevant to S.B.'s credibility and provided a motive to fabricate. Burns contended that they were admissible under Wis. Stat. § 906.07 (2007–08)[5] and Wis. Stat. § 906.08(2).[6] Furthermore, he

---

[3] S.B.'s mother passed away in 2002. Following her mother's passing, S.B. moved from Wisconsin where she lived with her mother to live with her father in South Carolina. She subsequently moved with her father to Missouri. After moving to live with her father, she visited her maternal grandparents in Wisconsin periodically.

[4] The same district attorney who tried Burns' case was the assigned district attorney on the grandfather's prosecution.

[5] Wisconsin Stat. § 906.07 provides: "Who may impeach. The credibility of a witness may be attacked by any party, including the party calling the witness."

All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

[6] Wisconsin Stat. § 906.08(2) provides:

argued that certain pretrial statements made by S.B., that called her credibility into question, fell under exceptions to Wisconsin's rape shield law, Wis. Stat. § 972.11(2)(b)(2)&(3).[7] Specifically, Burns pointed to S.B.'s statements that she was a virgin prior to Burns' assaults, that she was worried about being pregnant as a result of Burns' assaults, that her grandfather had never bothered her, and that she had never had any problems with anyone else in her family. Burns also sought to admit evidence of the victim's healed hymenal tears allegedly caused by the grandfather. Finally, citing *State v. Pulizzano,* 155 Wis. 2d 633, 456 N.W.2d 325 (1990), Burns stressed his right to mount a meaningful defense.[8] Prohibiting him from bringing up allegations against the grandfather, Burns argued, violated his constitutional right of confrontation and compulsory process.

¶ 6. The State sought to exclude those pretrial statements and evidence of the hymenal tears, arguing that they did not fit within one of the enumerated exceptions to the rape shield law or the exception created by *Pulizzano.* The State also moved to present

Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility, other than a conviction of a crime or an adjudication of delinquency as provided in s. 906.09, may not be proved by extrinsic evidence. They may, however, subject to s. 972.11 (2), if probative of truthfulness or untruthfulness and not remote in time, be inquired into on cross-examination of the witness or on cross-examination of a witness who testifies to his or her character for truthfulness or untruthfulness.

[7] See *infra* ¶¶ 31–32 for a discussion on the rape shield law.

[8] See *infra* ¶ 35 for a discussion of *State v. Pulizzano,* 155 Wis. 2d 633, 456 N.W.2d 325 (1990).

evidence that S.B.'s behavior following the alleged assaults by Burns was consistent with the behavior of other sexual assault victims, otherwise known in Wisconsin as "*Jensen* evidence."[9]

¶ 7. Applying the rape shield law and *Pulizzano,* the circuit court excluded all evidence relating to S.B.'s virginity.[10] The court also held that evidence of hymenal tears and of S.B.'s allegations against her grandfather was inadmissible unless the State first introduced evidence about the grandfather's conduct.

## C. Burns' Jury Trial

¶ 8. In August of 2006, Burns was tried to a jury. Burns argues in this appeal that several aspects of the trial prevented the real controversy from being fully tried. We begin with S.B.'s testimony. Of relevance here, S.B. spoke of her relationship with the grandfather. She

---

[9] In *State v. Jensen,* 147 Wis. 2d 240, 432 N.W.2d 913 (1988), also a child sexual assault case, we held it was permissible for an expert witness to testify that the complainant's post-assault behaviors were consistent with behaviors typically exhibited by child sexual assault victims. We concluded:

> [A]n expert witness may be asked to describe the behavior of the complainant and then to describe that of victims of the same type of crime, if the testimony helps the jury understand a complainant's reactive behavior. . . . [T]he circuit court may allow an expert witness to give an opinion about the consistency of a complainant's behavior with the behavior of victims of the same type of crime only if the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue.

*Id.* at 257.

[10] The circuit court concluded that evidence relating to S.B.'s virginity did not come in under one of the three enumerated exceptions to the rape shield law, *see infra* ¶¶ 31–34, or the exception created by *Pulizzano, see infra* ¶¶ 35–36.

said, "I've always been the grandpa's girl" and "[E]very-thing I did was with my grandfather since my dad was never there." Shortly thereafter, however, the court allowed the State to interrupt S.B.'s testimony and present the testimony of Michael P. (Michael) and Terri Stoff (Stoff), a social worker involved in the case.[11]

¶ 9. Michael, a friend of S.B.'s, testified that S.B. had revealed to him that her uncle had done "inappropriate things to her" and "things that he shouldn't have been doing as someone who is related to her." Pursuant to the pre-trial order excluding all evidence regarding S.B.'s virginity, Michael had been instructed not to testify that S.B. told him she did not think she was a virgin anymore because of the assaults by Burns and the grandfather. However, on redirect, the court allowed the following questioning by District Attorney Sharp (Prosecutor Sharp):

Q: [Michael], without saying exactly what [S.B.] said, did she say anything to you that indicated she believed her uncle had penetrated her?

A: Yes.

¶ 10. Following Michael and Stoff's testimony, S.B. retook the stand. During the direct examination of S.B., the following exchange took place:

Q: So on that day you told [Michael] what was going on with your uncle?

A: Yes.

Q: And do you recall what you told him about what was going on with your uncle?

---

[11] Michael and Stoff needed to testify at this time because they had a flight back to St. Louis that afternoon.

A: I had told him that I didn't think I was a virgin anymore and that I didn't know what had truthfully happened. I didn't—

Q: Okay, it sounds like you were expressing things with some degree of uncertainty when you were talking to him?

¶ 11. At this point, given the pre-trial order excluding any statements about S.B.'s virginity, Burns moved for a mistrial. In the alternative, Burns moved for permission to introduce evidence regarding the assaults by the grandfather for the purpose of attacking the truthfulness of S.B.'s testimony. If those motions were denied, Burns asked for permission to ask one question on cross-examination along the lines of "your statement that you weren't a virgin anymore, that wasn't true, was it?"

¶ 12. In response to Burns' requests, the court found that S.B.'s testimony was "inadvertent, accidental, not premeditated or calculated in any sense." The court went on: "I say that based on observing the witness after the statement was made. I'm convinced of that and I so find." Based on this finding, and the court's belief that it would be a violation of the rape shield law to admit evidence of the assaults by the grandfather, the court denied a mistrial. The court also denied Burns' two alternative requests, concluding "the best course of action is to simply leave it alone and continue with the trial." Prosecutor Sharp then finished his direct examination of S.B. and Attorney Benavidas had an opportunity to cross-examine her.

¶ 13. Burns also attacks the testimony of Dr. Beth Huebner, expert witness for the State. Dr. Huebner gave extensive *Jensen* testimony. In particular, she explained common post-assault behaviors exhibited by

adolescent sexual assault victims. She underscored certain "red flags" including: unhappiness, preoccupation, withdrawal, both physically and emotionally, loss of self-esteem, and irritability. She noted that there is often a dramatic drop in school grades.

¶ 14. Dr. Huebner testified that based on her review of S.B.'s case, S.B.'s behavior was consistent with that of other adolescent sexual assault victims. She noted that S.B. had become more irritable after the assaults allegedly took place, that her family struggled to figure out what had caused her change in behavior, and that her school grades fell. While Dr. Huebner was seemingly unaware that S.B. had engaged in self-cutting behavior,[12] she testified that self-cutting is very typical of sexual assault victims. Finally, Dr. Heubner testified that adolescents frequently have trouble recounting the facts of their assaults, both omitting facts and putting in facts that didn't actually occur.

¶ 15. On cross-examination, Attorney Benavides challenged Dr. Huebner's conclusions, pointing out that they were generalizations. In response to his questioning, Dr. Huebner testified to the existence of "false reporting" and admitted that, while there are tests available to examine a person's ability to perceive and relate reality, no such tests were performed on S.B. Moreover, she admitted she had never talked with S.B.

¶ 16. Following Dr. Huebner's testimony, the State rested. The first witness for Burns was his

---

[12] Dr. Huebner stated that she was not "aware [of any self-cutting] in this particular case." S.B., however, had testified that following the assaults she was plotting suicide and her self-cutting behaviors were so severe that her father and step-mother cleared out her room of objects she could use for cutting. When the self-cutting still didn't stop, they took her to Center Point, a psychiatric hospital in Missouri.

girlfriend, and alibi witness, Cynthia Schroeder (Schroeder). Schroeder testified about the grandfather's house—that it was old, creaky, and you could hear "just about anything anywhere." She also testified that on the night of the December 23, 2004, a night S.B. alleged that Burns had assaulted her, she and Burns had been together until they feel asleep, which was after four a.m. She testified that she and Burns had sexual relations, including sexual intercourse, from approximately two o'clock a.m. to four o'clock a.m. They slept in the same bed, and Schroeder was not awakened at any other point during the night, despite her testimony that she was a "light sleeper." Moreover, Schroeder testified that the following morning she observed S.B. and S.B. "seemed fine" and that Schroeder "didn't notice anything different" about S.B.

¶ 17. Burns also called the grandfather to the stand. He opined about S.B.'s character in regard to truthfulness. He said that she was "untruthful" and "there is times that she has stretched the truth some." Moreover, the grandfather explicitly disavowed portions of S.B.'s testimony that related to him, e.g., that the grandfather had asked Burns if anything was going on between Burns and S.B. The court's order prohibiting evidence of the grandfather's assaults prevented the State from cross-examining the grandfather on his motive for characterizing S.B. as untruthful.

¶ 18. The last portion of Burns' trial relevant to Burns' claim that the real controversy was not fully tried, is Prosecutor Sharp's closing arguments. Prosecutor Sharp argued, "There's nothing in this girl's past to suggest that she has any kind of questionable past . . . that she was having any problems other than normal teenage girl problems, if even those, prior to this visit at Christmas time of 2004 . . . ." In rebuttal, Prosecutor

Sharp reiterated this point: "All the evidence in the record shows [that] when she came home from [her visit to Wisconsin] she was experiencing problems for no reason, no reason anybody could make heads or tails out of until she revealed what happened." Later in rebuttal he stated:

> No one can suggest a reason, again, as to why she was displaying the behaviors that she was that Dr. Huebner talked about as being consistent with that of someone who was sexually assaulted. There's no other thing that went on in her life at that period of time that would explain those behaviors. . . .
>
> There is no explanation here for why she was acting the way she was and why it persisted for as long as it did.

In his closing, Prosecutor Sharp also emphasized that Burns had not suggested any motive on S.B.'s part to lie, and that none existed.

¶ 19. The jury found Burns guilty of 11 counts of sexual assault.[13] Burns was sentenced to a total of 25 years of initial confinement and ten years of extended supervision.

### D. The Grandfather's Trial

¶ 20. Portions of S.B.'s testimony at the grandfather's trial in December of 2007 are also relevant to the issue here. In particular, at the grandfather's trial, S.B. admitted that she was untruthful at Burns' trial when she said she told Michael she

---

[13] At the close of evidence, the court dismissed count 10, the count based on Burns' performing oral sex on S.B., because Prosecutor Sharp never introduced evidence to satisfy this count.

743

didn't think she was a virgin anymore because of what Burns had done to her, therefore implying Burns took her virginity.[14] She testified as follows during her cross-examination by Attorney Schrader, counsel for the grandfather:

> Q: Were you under oath to tell the truth at [Burns' trial]?
>
> A: Yes.
>
> Q: And did you tell the truth?
>
> A: No.
>
> . . .
>
> Q: . . . you are saying that you were not a virgin when you had intercourse with your uncle in 2004, is that correct?
>
> A: That is correct. That was a slip on my part during that trial.

Attorney Schrader next read the portion of S.B.'s testimony from Alan Burns' trial about her virginity. The following exchange then occurred:

> Q: . . . Did you give those answers to those questions?
>
> A: Yes, I did, but they weren't directed towards my grandfather.
>
> Q: Just so we have a context here, you were talking to Michael [], correct, your friend in Missouri?
>
> A: Yes, sir.
>
> Q: You told him that you were telling him that you didn't think you were a virgin anymore, correct?

---

[14] At the grandfather's trial, evidence of Burns' assaults was admitted.

A: Yes. I told him that when I had told him, because when I came out to him and everything I told him about my uncle and my grandfather at the same time.

Q: But you were referring him to the actions that your uncle had with you, the intercourse your uncle had with you?

A: No. I was referring to my grandfather and uncle. It was in the context of when I told Michael I was—I had been sexually assaulted by my grandfather and uncle and I don't think I'm a virgin anymore because of the intercourse. It was directed for both of them. It wasn't directed toward one single person.

On redirect-examination, Prosecutor Sharp elicited testimony from S.B. explaining why she was untruthful at Burns' trial:

Q: Why did you only say uncle at trial?

A: I was put under a motion by the court that I could not talk about my grandfather at all. Everything had to be in context to my uncle with not mentioning anything about my grandfather.

Q: Now, yesterday at the very end Mr. Schrader asked you a question whether or not you told the truth at the prior trial and you hesitated for a long time and then said no. Why did you say no?

A: I said no because the reason why I said no is because of that motion that was put through. I couldn't actually tell the truth of well, yes, I'm not a virgin. I have had intercourse, because my grandfather could not be brought into that trial. I had to cover up for my grandfather during that trial and just make it sound like everything was based on my

745

uncle without going into further context of any-
thing with my grandfather.[15]

## E. Post-Conviction Proceedings and Appeal

¶ 21. Burns moved for post-conviction relief in
the interest of justice.[16] The circuit court denied his
motion. Burns then appealed the judgment convicting
him of ten counts of second-degree sexual assault of a
child. *State v. Burns*, No. 2009AP118–CR, unpublished
slip op. (Wis. Ct. App. Jan. 28, 2010). The court of
appeals affirmed the judgment of conviction, conclud-
ing that the real controversy had been fully tried.

¶ 22. We granted review and now affirm.

## II. DISCUSSION

### A. Standard of Review

¶ 23. When the contention is made that the real
controversy has not been fully tried, we determine
whether to exercise our discretionary power of reversal
independently of prior court decisions. *See Vollmer v.*

---

[15] The December 5, 2007 trial of the grandfather resulted in
a hung jury on two counts and an acquittal on a third. Upon
re-trial in July of 2008, the grandfather was found guilty of two
counts of sexual assault.

[16] In his motion for post-conviction relief, Burns made
several other claims that are not before us. First, he argued that
the court should overturn the jury verdict on count 12—the
count based on sexual intercourse—because the verdict was not
supported by sufficient evidence. The court granted this relief
and that decision was not appealed. Second, Burns argued that
the court should grant a new trial because his counsel was
ineffective. The court disagreed, denying a new trial on this
ground. Burns did not appeal this issue.

*Luety,* 156 Wis. 2d 1, 19, 456 N.W.2d 797 (1990). Moreover, "[w]hether a defendant's right to due process was violated [is] a question of law" for our independent review. *State v. McGuire,* 2010 WI 91, ¶ 26, 328 Wis. 2d 289, 786 N.W.2d 227.

## B. Interest of Justice

¶ 24. We have the ability to set aside a conviction through the use of our discretionary-reversal powers.[17] There are two categories of cases in which we may reverse in the interest of justice: (1) when the real controversy has not been fully tried and (2) when it is probable that justice has miscarried for any reason. *State v. Schumacher,* 144 Wis. 2d 388, 417, 424 N.W.2d 672 (1988). We established the analyses for a motion to set aside a conviction based on our discretionary reversal powers in *Schumacher.* We explained that:

> under the "real controversy not fully tried" category, two different situations were included: (1) Either the jury was not given an opportunity to hear important testimony that bore on an important issue in the case, or (2) the jury had before it testimony or evidence

---

[17] Our discretionary power to reverse judgments arises from both statute and common law. *Vollmer v. Luety,* 156 Wis. 2d 1, 13, 456 N.W.2d 797 (1990). The statutory power arises from Wis. Stat. § 751.06 that directs:

> In an appeal in the supreme court, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record, and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

which had been improperly admitted, and this material obscured a crucial issue and prevented the real controversy from being fully tried.

Under the second prong of the discretionary-reversal statute, the "miscarriage of justice" prong, the case law made clear that, in order to grant a discretionary reversal under this prong, the court would have to conclude that there would be a substantial probability that a different result would be likely on retrial.

*Id.* at 400–01 (citing *State v. Wyss,* 124 Wis. 2d 681, 741, 370 N.W.2d 745 (1985), *overruled on other grounds, State v. Poellinger,* 153 Wis. 2d 493, 451 N.W.2d 752 (1990)). *See also State v. Armstrong,* 2005 WI 119, ¶ 181, 283 Wis. 2d 639, 700 N.W.2d 98 (Roggensack, J., dissenting).

¶ 25. We exercise our discretionary-reversal powers " 'only in exceptional cases.' " *McGuire,* 328 Wis. 2d 289, ¶ 59 (citing *State v. Hicks,* 202 Wis. 2d 150, 161, 549 N.W.2d 435 (1996)). *See also, State v. Watkins,* 2002 WI 101, ¶ 79, 255 Wis. 2d 265, 647 N.W.2d 244 (concluding that discretionary-reversal power "should be exercised sparingly and with great caution"). As we have explained:

Such exceptional cases are generally limited to cases in which the jury was erroneously denied the opportunity to hear important testimony bearing on an important issue of the case, when the jury had before it evidence not properly admitted that "so clouded a crucial issue that it may be fairly said that the real controversy was not fully tried," or when an erroneous instruction prevented the real controversy in a case from being tried.

*State v. Doss,* 2008 WI 93, ¶ 86, 312 Wis. 2d 570, 754 N.W.2d 150 (quoting *Hicks,* 202 Wis. 2d at 160). In determining whether a new trial is necessary to accomplish the ends of justice, we employ a totality-of-the-circumstances analysis. *McGuire,* 328 Wis. 2d 289, ¶ 59.

¶ 26. Burns argues that he is entitled to a new trial in the interest of justice pursuant to Wis. Stat. § 751.06. We agree with the court of appeals that the real controversy here was whether S.B. truthfully alleged that Burns sexually assaulted her. *See Burns,* No. 2009AP118–CR, unpublished slip op., ¶ 23. We interpret Burns' argument to be that this controversy remains untried because: (1) S.B. gave an incomplete statement that implied that Burns took her virginity, and Burns was unable to challenge S.B. on her statement; (2) the jury did not hear evidence of the grandfather's prior sexual assaults, specifically during the cross-examination of Dr. Huebner; and (3) Prosecutor Sharp made improper statements during his closing arguments. If, individually, the above factors do not merit a new trial in the interest of justice, Burns argues that they do so collectively.

¶ 27. Taking each of Burns' arguments in turn, and then considering them collectively, we conclude that the real controversy was fully tried; accordingly, a new trial is not warranted in the interest of justice.

## 1. S.B.'s testimony

¶ 28. As discussed above, *see supra* ¶ 10, S.B. testified at Burns' trial that she "didn't think [she] was a virgin anymore" because of "what was going on with [her] uncle" (hereinafter "S.B.'s virginity testimony"). This testimony violated the pre-trial order that precluded testimony regarding S.B.'s virginity.

¶ 29. Burns moved for a mistrial. In the alternative, he moved for permission to cross-examine S.B. on the grandfather's assaults or ask S.B. if she was telling the truth when she implied she lost her virginity to Burns. The trial court denied all three motions. Burns

contends that S.B.'s virginity testimony, uncontro-
verted by cross-examination, allowed the jury to make
the incorrect inference that Burns took S.B.'s virginity.

¶ 30. Burns' argument on this issue is twofold.
First, Burns argues that while the pre-trial ruling
excluding evidence of the grandfather's assaults was
correct, once S.B made the misleading virginity state-
ments on direct, testimony regarding the assaults by
the grandfather became admissible to challenge the
veracity of those statements and, hence, S.B.'s credibil-
ity. Second, the virginity testimony was improper given
the pre-trial order. Burns contends that this improper
testimony so clouded a crucial issue of the case that a
new trial in the interest of justice is warranted.

¶ 31. Starting with the first of Burns' arguments
—once S.B made the misleading virginity statements on
direct, evidence of the assaults by the grandfather
became admissible to challenge the veracity of those
statements—we discuss whether evidence of the as-
saults by the grandfather was admissible given the rape
shield law and *Pulizzano*. Under Wisconsin's rape shield
law, Wis. Stat. § 972.11(2)(b):

> If the defendant is accused of a crime under s.
> 940.225, 948.02, 948.025, 948.05, 948.051, 948.06,
> 948.085, or 948.095, or under s. 940.302(2), if the court
> finds that the crime was sexually motivated, as defined
> in s. 980.01(5), any evidence concerning the complain-
> ing witness's prior sexual conduct or opinions of the
> witness's prior sexual conduct and reputation as to
> prior sexual conduct shall not be admitted into evi-
> dence during the course of the hearing or trial, nor
> shall any reference to such conduct be made in the
> presence of the jury, except the following, subject to s.
> 971.31(11):
>
> 1. Evidence of the complaining witness's past con-
> duct with the defendant.

2. Evidence of specific instances of sexual conduct showing the source or origin of semen, pregnancy or disease, for use in determining the degree of sexual assault or the extent of injury suffered.

3. Evidence of prior untruthful allegations of sexual assault made by the complaining witness.

¶ 32. The rape shield law "reflect[s] the . . . view that generally evidence of a complainant's prior sexual conduct is irrelevant or, if relevant, substantially outweighed by its prejudicial effect." *Pulizzano,* 155 Wis. 2d at 644.

¶ 33. The evidence of the assaults by the grandfather is evidence concerning S.B.'s prior sexual conduct. Therefore, unless it meets one of the three enumerated exceptions to the rape shield law, it is impermissible evidence under Wis. Stat. § 972.11(2)(b).

¶ 34. This evidence does not fit under any of the three enumerated exceptions in Wis. Stat. § 972.11(2)(b). First, it is not evidence of S.B.'s past conduct with Burns. Second, it is not evidence of specific instances of conduct showing the source or origin of semen, pregnancy, or disease. Third, it is not evidence of untruthful allegations of sexual assault made by the complaining witness.[18] Therefore, the evidence of the grandfather's assaults is not admissible under a statutory exception to the rape shield law.

---

[18] To the contrary, Burns argued at his trial, which took place before the grandfather had been tried and adjudicated guilty, that the allegations against the grandfather were true. In other words, Burns argued that S.B. was being truthful about the assaults by the grandfather, but lying about Burns' assaults.

751

¶ 35. *Pulizzano* provides another exception to the rape shield law separate and apart from the three enumerated exceptions in Wis. Stat. § 972.11(2)(b)1.-3. *Pulizzano* concludes that while evidence may be inadmissible under the rape shield law, there are instances when it may be admitted to protect a defendant's right to mount a meaningful defense. We held in *Pulizzano* that:

> [T]o establish a constitutional right to present otherwise excluded evidence of a child complainant's prior sexual conduct . . . prior to trial the defendant must make an offer of proof showing: (1) that the prior acts clearly occurred; (2) that the acts closely resembled those of the present case; (3) that the prior act is clearly relevant to a material issue; (4) that the evidence is necessary to the defendant's case; and (5) that the probative value of the evidence outweighs its prejudicial effect. If the defendant makes that showing, the circuit court must then determine whether the State's interests in excluding the evidence are so compelling that they nonetheless overcome the defendant's right to present it.

*Id.* at 656–57.

██

¶ 36. The third element of the *Pulizzano* test—that the prior act is clearly relevant to a material issue—precludes admission of evidence of the grandfather's assaults under the *Pulizzano* exception to the rape shield law. Evidence of the grandfather's assaults is not "clearly relevant" to the issue of S.B.'s allegation that Burns sexually assaulted her. There is no assertion that S.B. lied about the grandfather's conduct, and her truthfulness about those sexual assaults is not probative of Burns' claim that she lied about his conduct with her. Burns does not provide any compelling argument that S.B.'s assault by the grandfather is "clearly relevant" to whether she is being untruthful in her

allegations against Burns.[19] The circuit court did not err when it denied Burns' motion to cross-examine S.B. on the alleged assaults by the grandfather.

■

¶ 37. We now turn to the second of Burns' arguments regarding S.B.'s virginity testimony. Burns contends that even if the circuit court did not err when it denied Burns' motion to cross-examine S.B. on the assaults by the grandfather, S.B.'s virginity testimony was improper because the pre-trial order excluded all evidence of S.B.'s virginity.[20] For improperly introduced evidence to merit a new trial in the interest of justice, the testimony must "so cloud[] a crucial issue that it may be fairly said that the real controversy was not fully tried." *Hicks,* 202 Wis. 2d at 160. S.B.'s virginity testimony does not meet this standard.

¶ 38. We agree with the court of appeals that S.B.'s testimony at the grandfather's trial that her virginity testimony at Burns' trial was untruthful and that she said she "had to cover up for [her] grandfather during [Burns'] trial," does not suggest that S.B. falsely attributed acts of the grandfather to Burns.[21] *See Burns,* No. 2009AP118–CR, unpublished slip op., ¶ 31.

[19] While it is possible other elements of the *Pulizzano* test also preclude Burns' argument that the evidence is admissible under the *Pulizzano* exception to the rape shield law, because all five elements of the test must be met, we stop our analysis at the third element.

[20] The pre-trial ruling was based on the rape shield law, that, as discussed above, *see* ¶¶ 31–34, prohibits either party from admitting evidence "concerning the complaining witness's prior sexual conduct." Consequently, S.B.'s virginity testimony also arguably violated the rape shield law.

[21] Paragraph 20 supra quotes S.B.'s testimony at the grandfather's trial.

Rather, her testimony shows that she was referring to both the grandfather and Burns. She explained that it "was in the context of when I told Michael I was—I had been sexually assaulted by my grandfather and uncle and I don't think I'm a virgin anymore because of the intercourse. It was directed for both of them. It wasn't directed toward one single person." At Burns' trial, S.B. did nothing more than to remove the grandfather from her virginity comment, a choice that S.B. believed was required by her understanding of the pre-trial order. Consequently, she "omitted reference to her grandfather when it would have been more truthful in her view to also mention what her grandfather did to her." *Id.*

¶ 39. Burns argues at length that S.B.'s virginity testimony was particularly prejudicial because the concept of rape of a virgin causes significantly more outrage in our society than rape of a non-virgin, especially in "agricultural county" where this trial took place. We disagree with Burns, and conclude that given the facts of this case, testimony that S.B. lost her virginity to Burns is not more prejudicial than testimony that Burns had intercourse with a 14–year-old child.

¶ 40. Furthermore, while Burns was not allowed to challenge the veracity of S.B.'s virginity statement, he was able to challenge S.B.'s allegation that Burns had intercourse with her. For example, on cross-examination of S.B., she admitted that when she reported the assaults, she didn't mention intercourse and that she wasn't sure whether Burns had intercourse with her.[22]

---

[22] On cross-examination, Attorney Benavides asked S.B. if it was fair to say that her answer on direct examination indicated she was not sure whether Burns had intercourse with her. She responded, "I didn't want to say yes because I wasn't 100 percent sure and positive, and I don't believe in saying yes

¶ 41. Moreover, Attorney Benavides was able to challenge S.B.'s credibility on numerous other points during cross-examination. For instance, she admitted that she had given incorrect testimony during direct examination. She admitted that prior to trial she had never mentioned that on both occasions when Burns had intercourse with her, he removed her tampon.

¶ 42. Further, Burns also called an alibi witness, his girlfriend, Schroeder, who testified that she was with Burns on the night in December when S.B. said Burns assaulted her, therefore disputing S.B.'s allegations of what took place during the December visit. Schroeder also spoke of the characteristics of the house in which S.B. alleged the assaults had taken place, noting that you could hear movement throughout the house. Her testimony questioned the veracity of S.B.'s claims that assaults were taking place while her grandparents were downstairs. By challenging her credibility on previous statements, Burns placed S.B.'s truthfulness, including her allegation that Burns sexually assaulted her, directly before the jury.

¶ 43. In sum, S.B.'s testifying in a way that could imply that Burns took her virginity did not differ in any significant way from her allegation that Burns had intercourse with her when she was 14 years old; Burns was able to challenge S.B.'s truthfulness that intercourse took place. We conclude, therefore, that S.B.'s virginity testimony did not so cloud the critical issue of whether S.B. lied about what Burns did, as to warrant a new trial in the interest of justice.[23]

---

he did have intercourse with me when I'm not 100 percent positive." She continued, "I'm still not 100 percent positive."

[23] We also note that "in Wisconsin, when one party accidentally . . . takes advantage of a piece of evidence that is otherwise

## 2. Dr. Huebner's testimony

¶ 44. Burns next contends that he should have been allowed to cross-examine Dr. Huebner to elicit testimony about an alternative explanation for S.B.'s behaviors. Namely, that her behaviors may have been a result of the assaults by the grandfather.

¶ 45. Discretionary reversals based on a determination that the jury was denied the opportunity to hear important evidence have occurred when "the jury was erroneously denied the opportunity" to hear important, relevant evidence while other evidence was erroneously admitted. *Doss,* 312 Wis. 2d 570, ¶ 86. The "erroneous" denial of relevant evidence refers to a legal evidentiary error by the trial court. *See, e.g., State v. Cuyler,* 110 Wis. 2d 133, 141, 327 N.W.2d 662 (1983) ("We conclude that the case was not fully tried inasmuch as the circuit court erred in its interpretation of sec. 906.08(1) and excluded admissible and material evidence on the critical issue of credibility."); *State v. Joyner,* 2002 WI App 250, ¶ 25, 258 Wis. 2d 249, 653 N.W.2d 290.

¶ 46. Here, as discussed above, *see supra* ¶¶ 30–36, the circuit court did not err when it excluded evidence of the alleged assaults by the grandfather. Evidence of the assaults by the grandfather was inadmissible under the rape shield law and the exception created by *Pulizzano.*

---

inadmissible, *the court may, in its discretion,* allow the opposing party to introduce otherwise inadmissible evidence if it is required by the concept of fundamental fairness to cure some unfair prejudice." *State v. Dunlap,* 2002 WI 19, ¶ 32, 250 Wis. 2d 466, 640 N.W.2d 112 (emphasis added). Here, the circuit court exercised its discretion and decided that the best course of action was to continue with the trial and not disrupt any of the court's pre-trial rulings.

### 3. Prosecutor Sharp's closing arguments

¶ 47. Burns argues that Prosecutor Sharp's statements in closing argument were so improper as to warrant a new trial in the interest of justice. Burns contends that Prosecutor Sharp misrepresented that there was no other explanation for S.B.'s behavior subsequent to Burns' assaults, when the assaults by the grandfather could explain S.B.'s behavior. Burns contends that these statements went beyond an analysis of the evidence and constituted a misstatement of fact. Further, Burns claims that Prosecutor Sharp unfairly referred to a court's legal ruling in an attempt to convince the jury of his point of view.

■■■■

¶ 48. Counsel is allowed considerable latitude in closing arguments, with discretion given to the trial court in determining the propriety of the argument. *State v. Draize,* 88 Wis. 2d 445, 454, 276 N.W.2d 784 (1979). A "prosecutor may comment on the evidence, detail the evidence, argue from it to a conclusion and state that the evidence convinces him and should convince the jurors." *Id.* (internal quotations omitted). The prosecutor should aim to "analyze the evidence and present facts with a reasonable interpretation to aid the jury in calmly and reasonably drawing just inferences and arriving at a just conclusion upon the main or controlling questions." *Id.* (citing *State v. Genova,* 242 Wis. 555, 561, 8 N.W.2d 260 (1943)). It is impermissible, therefore, for a prosecutor to suggest the jury reach its verdict by considering facts not in the evidence.[24] *Id.*

---

[24] The United States Supreme Court has long held that a prosecutor "may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not

¶ 49. When deciding whether a prosecutor's statements necessitate a new trial in the interest of justice, the test applied is whether the statements " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *State v. Mayo,* 2007 WI 78, ¶ 43, 301 Wis. 2d 642, 734 N.W.2d 115 (quoting *State v. Davidson,* 2000 WI 91, ¶ 88, 236 Wis. 2d 537, 613 N.W.2d 606). "Even if there are improper statements by a prosecutor, the statements alone will not be cause to overturn a conviction. Rather, the statements must be looked at in context of the entire trial." *Id. See also United States v. Young,* 470 U.S. 1, 11 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.").

¶ 50. In Prosecutor Sharp's closing argument, he made several statements inferring that there was nothing else that could explain S.B.'s behavior in the winter and spring of 2004, the behavior that Dr. Heubner had testified was consistent with the behavior of sexual assault victims. For example, he stated that there was nothing in S.B.'s "past to suggest . . . she was having any problems other than normal teenage girl problems . . . prior to [the] visit at Christmas time of 2004." In rebuttal he argued,

---

at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States,* 295 U.S. 78, 88 (1935), *overruled on other grounds, Stirone v. United States,* 361 U.S. 212 (1960).

No one can suggest a reason, again, as to why she was displaying the behaviors that she was that Dr. Huebner talked about as being consistent with that of someone who was sexually assaulted. There's no other thing that went on in her life at that period of time that would explain those behaviors.

. . .

The evidence in this case doesn't make any sense except one way, that during that period of time when her uncle absolutely had the opportunity to sexually assault her, he did . . . .

¶ 51. We understand why Prosecutor Sharp's comments are troublesome to Burns. However, prosecutors comment on evidence before the jury; they do not comment on evidence the jury has not heard. We also note that Prosecutor Sharp's first statement about the lack of an alternative explanation for S.B.'s behaviors in his rebuttal argument—the portion of the closing arguments that Burns contends contains the most improprieties—highlighted that he was focusing on the record before the jury. He stated, "All the evidence *in the record* shows when she came home from [her visits to Wisconsin] she was experiencing problems for no reason, no reason that anybody could make heads or tails out of until she revealed what happened. Otherwise, there's no explanation for it." (Emphasis added).

¶ 52. Burns agrees that the circuit court's initial ruling precluding testimony about the grandfather's sexual assaults was correct, yet his criticism of the prosecutor's closing argument is grounded in the notion that the jury should have known of the grandfather's prior sexual assaults. We are unpersuaded by Burns' argument. Prosecutor Sharp's statements in closing argument did not muddle the jury's understanding of the evidence before them.

¶ 53. Accordingly, upon examining Prosecutor Sharp's statements in the context of the entire trial, we conclude that they did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process."[25] *Mayo,* 301 Wis. 2d 642, ¶ 43 (citation omitted).

### 4. Totality of the evidence

¶ 54. Finally, Burns argues that if each above event, independently, does not merit a new trial in the interest of justice, then the combination of the events resulted in an unfair trial that produced a verdict in which we should not have confidence. An analysis of the events together, however, does not minimize our confidence in the verdict so as to warrant discretionary-reversal.

¶ 55. This was a trial of S.B.'s credibility as the reporter of sexual assaults by Burns. Attempting to undermine her credibility was the central focus of Burns' defense. In that regard, Burns was able to challenge S.B.'s credibility numerous times throughout the trial. For example, he called the grandfather to testify about

---

[25] Burns cites *State v. Bvocik,* 2010 WI App 49, 324 Wis. 2d 352, 781 N.W.2d 719 and *State v. Weiss,* 2008 WI App 72, 312 Wis. 2d 382, 752 N.W.2d 372 as support for his position that Prosecutor Sharp violated his due process rights. However, the prosecutor's statement that the anticipated victim was only 14 years old when he knew she was 28, in *Bvocik,* and the prosecutor's false statement that Weiss never denied committing the crime until he testified at trial, in *Weiss,* burdened the respective defendants' due process rights under the totality-of-the-circumstances present in those cases. Under the totality-of-the-circumstances here, Prosecutor Sharp's statements did not do so.

S.B.'s character for truthfulness. In his testimony, the grandfather claimed that S.B. was "untruthful" and there were "times that she stretched the truth some." He also testified that S.B. made up certain events in which she claimed the grandfather had been involved; for example, that the grandfather had confronted Burns about his interactions with S.B. All of this testimony came after S.B.'s testimony that she was "Grandpa's girl" and without any cross-examination by the State on the grandfather's motive to portray S.B. as a liar because the State was precluded from questioning the grandfather about his own conduct with S.B. And finally, Burns cross-examined S.B. extensively. The issue of S.B.'s credibility was fully tried. The jury believed S.B. and convicted Burns.

## III. CONCLUSION

¶ 56. The issue presented in this case is whether the real controversy, that is, whether S.B. lied when she alleged Burns sexually assaulted her, was fully tried. Burns argues S.B.'s truthfulness was not fully tried and he, therefore, is entitled to a new trial in the interest of justice. After thorough review of the record, we conclude that the real controversy was fully tried. Therefore, a new trial in the interest of justice is not warranted. Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 57. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). The issue presented is whether Burns is entitled to a new trial in the interest of justice when (1) the circuit court barred Burns from presenting evidence

that the accuser's post-assault behavior and loss of virginity were caused by her having been sexually assaulted by her grandfather rather than by Burns; and (2) the State's closing argument misleadingly stated that no explanation existed for the accuser's post-assault behavior other than Burns' guilt. I conclude that Burns should be given a new trial under these circumstances.

¶ 58. Applying the totality of the circumstances test, I conclude that the real controversy of the case is whose story was more credible, the accuser's or Burns'. This issue was not fully tried. Accordingly, I would grant the defendant a new trial.

¶ 59. The State's case focused on buttressing the credibility of the accuser, especially through expert testimony describing the reaction of a sexual assault victim. Burns' case relied heavily on impeaching the credibility of the accuser and presenting an alternative story for the events in the time period in question. Burns was not able to introduce evidence relating to the accuser's allegations of the grandfather's conduct that would have called into question the strength of the State's case.

¶ 60. The prosecutor exacerbated the defendant's inability to introduce evidence by inviting the jury to infer that there was nothing other than Burns' conduct that "went on in her life at that period of time that would explain those behaviors . . . ." Majority op., ¶ 50.

¶ 61. But there was something else going on in the accuser's life that would explain those behaviors. The accuser was being sexually assaulted by her grandfather. And the prosecutor knew these facts even though he prevented the jury from knowing the facts.

¶ 62. Due process requires that the real controversy be fully tried, not merely tried to some extent.

The State argues that the defendant was able to develop an effective defense strategy. The majority opinion concludes that because Burns was able to challenge the "she said" evidence on numerous points, the real controversy was fully tried. I disagree. Burns was able to go to trial with only "half a story"; he could not present the other half, namely the grandfather's alleged assault.

¶ 63. I conclude that the prosecutor's closing statements are more than merely "troublesome," as the majority understates. The prosecutor exploited evidence that was excluded from trial at the prosecutors' request.[1] The prosecutor asked the jury to infer a fact that the prosecutor knew was false. "Prosecutors may not ask jurors to draw inferences that they know or should know are not true. That is what occurred here and it is improper."[2]

¶ 64. The majority "understands why" the prosecutor's statements in closing argument are "troublesome," majority op., ¶ 51, but concludes that the prosecutor's comments did not "muddle the jury's understanding of the evidence," majority op., ¶ 52, and did not "infect the trial with unfairness," majority op., ¶ 53.

¶ 65. And how does the majority support its conclusions? Because, says the majority, the prosecutor said he was talking about what was in the "record." The

---

[1] "Counsel may not, in closing, 'exploit[] the absence of evidence that had been excluded at his request.' Such exploitation of absent, excluded evidence is 'fundamentally unfair' and 'reprehensible.' '[A] party's success in excluding evidence from the consideration of the jury does not later give that party license to invite inferences (whether true or, as in this case, false) regarding the excluded evidence.' " *Commonwealth v. Harris*, 443 Mass. 714, 732, 825 N.E.2d 58 (2005) (internal citations omitted).

[2] *State v. Weiss*, 2008 WI App 72, ¶ 15, 312 Wis. 2d 382, 752 N.W.2d 372.

majority places a great deal of weight on that one word, "record." Nowhere is the word "record" defined for the jury. It is a word with special meaning to law-trained people.

¶ 66. As a result of the exclusion of evidence and the prosecutor's closing argument, the controversy was not fully tried. The case violates a basic rule of criminal law: "To maintain the integrity of our system of criminal justice, the jury must be afforded the opportunity to hear and evaluate such critical, relevant, and material evidence, or at the very least, not be presented with evidence on a critical issue that is later determined to be inconsistent with the facts."[3]

¶ 67. Because the jury did not hear evidence central to the determination of whose story was more credible and in his closing statement the prosecutor invited the jury to make an inference he knew was incorrect, I conclude that the real controversy was not fully tried.[4]

¶ 68. For the reasons set forth, I dissent.

¶ 69. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

---

[3] *State v. Hicks,* 202 Wis. 2d 150, 171, 549 N.W.2d 435 (1996).

[4] Two recent court of appeals decisions support my reasoning. *See State v. Weiss,* 2008 WI App 72, ¶ 17, 312 Wis. 2d 382, 752 N.W.2d 372; *State v. Bvocik,* 2010 WI App 49, 324 Wis. 2d 352, 781 N.W.2d 719.