# COURT OF APPEALS
## DECISION
## DATED AND FILED

## November 27, 2019

Sheila T. Reiff
Clerk of Court of Appeals

## NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP1385-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2015CF1094**

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

SHELTON M. KINGCADE,

DEFENDANT-APPELLANT.

APPEAL from a judgment and orders of the circuit court for Dane County: WILLIAM E. HANRAHAN, Judge. *Affirmed*.

Before Fitzpatrick, P.J., Kloppenburg and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Shelton Kingcade appeals a judgment of conviction for one count of repeated sexual assault of a child and one count of second-degree sexual assault of a child. He also appeals the circuit court's orders denying his motion for postconviction relief and motion for reconsideration.

¶2 Kingcade raises three issues on appeal. First, he asserts that his trial counsel was ineffective in numerous respects. Second, he argues that the State withheld impeachment evidence in violation of **Brady v. Maryland**, 373 U.S. 83 (1963). Third, he asserts that the circuit court made such serious errors that we should invoke our statutory powers to reverse in the interest of justice.

¶3 For the reasons set forth below, we reject all of Kingcade's arguments and affirm.

## BACKGROUND

¶4 In 2015, the State filed a complaint alleging that Kingcade had repeatedly sexually assaulted F.F. between November 1997 and November 2000 and that he had committed a single sexual assault against S.W. between December 1, 1991, and January 31, 1992.

¶5 Over the course of the four-day trial, there were eighteen prosecution witnesses and two defense witnesses. The State presented F.F., who testified as follows. When F.F. was in middle and high school, she and Kingcade had penis-to-vagina intercourse numerous times. In 1997, when the sexual assaults began, F.F. was a thirteen-year-old middle school student with a turbulent home life. Both of her parents drank heavily, her father physically abused her mother, and one of her two older siblings spent time in jail. For F.F., Kingcade was initially a trusted and respected authority figure—he coached her basketball team as part of

the Neighborhood Intervention Program. Through Kingcade's coaching, F.F. and Kingcade ended up spending a great deal of time together, particularly when Kingcade would drive F.F. to various places as part of his coaching responsibilities.

¶6    Initially, in addition to being her coach, Kingcade was also her confidant, someone with whom she could talk about her difficult home life. When F.F. was in seventh or eighth grade, Kingcade began asking her sexually-charged questions. He eventually began buying her expensive items (basketball shoes, a cell phone, lingerie, and jewelry), and taking her to sit-down restaurants.

¶7    While F.F. was still in middle school, Kingcade began to have sexual contact with her. The first sexual contact was when Kingcade touched F.F.'s breasts while she and Kingcade were in a hotel room. This behavior escalated, and Kingcade and F.F. had sexual intercourse many times over several years, both in his apartment and at hotels, including the hotel where he worked. Kingcade's daughter, Monica Davidson, was often present when F.F. and Kingcade were together, including when they went to restaurants and when she was at Kingcade's apartment and at the hotel where he worked.

¶8    F.F. also knew certain personal details about Kingcade. She described, in detail, the inside of Kingcade's apartment. F.F. identified a scar on Kingcade's abdomen that was hidden by his shirt. F.F.'s teammates testified that Kingcade did not take off his shirt at practices.

¶9    Several of F.F.'s acquaintances, family members, and teammates testified regarding Kingcade's interactions with F.F. F.F.'s younger brother testified that he had informed a detective that Kingcade and F.F. "hung out way too much." F.F.'s brother also testified that he had spent time with F.F. and

3

Kingcade, going to movies, dinner, softball games, and Kingcade's apartment. F.F.'s teammates testified that, although they lived no more than a block from F.F. and a block apart from each other, Kingcade would always drop F.F. off last. One teammate testified that, for a period of months, she observed Kingcade drop F.F. off in his personal vehicle after 10 p.m. at least two to three times per week. F.F.'s teammates also testified that, despite the closeness of the team—and in their view, Kingcade's favoritism of F.F.—F.F. eventually became increasingly distant at basketball practices and games.

¶10 Witnesses further testified that they were suspicious about the nature of the relationship between F.F. and Kingcade, and that F.F.'s behavior and demeanor changed during this time period. One of these witnesses was Annetta Wright. Wright was the team director at the Madison Boys and Girls Club where Kingcade's basketball team played, and F.F. babysat for Wright's children. Wright testified that she asked F.F. about her suspicions at the time, but F.F. denied any improper behavior. Another witness, F.F.'s older sister, testified that she observed F.F. and Kingcade sitting in his car talking for longer than was necessary to drop F.F. off and that F.F. sometimes did not come home at night. F.F.'s sister testified that she was suspicious about the nature of the relationship between F.F. and Kingcade and told her parents about her suspicions but, to the best of her knowledge, they did nothing. She testified that she purchased a disposable camera and went to Kingcade's residence to attempt to "catch them together" so that she could let her parents know that "something inappropriate was happening," but that she was unsuccessful in obtaining a photograph.

¶11 The State also called as a witness the other victim, S.W., and asked her whether she recalled the substance of a 2015 interview with Detective Julie Johnson during which S.W. stated that Kingcade had sexually assaulted her in

1991. S.W. testified that she recalled that Detective Johnson interviewed her but, when asked whether she told the detective certain information about Kingcade, S.W. either denied or stated that she did not remember telling the detective the information. During cross-examination, S.W. testified that she did not want to testify and that she felt coerced and manipulated into being in court.

¶12 The State called Detective Johnson, who testified about her 2015 interview with S.W. Johnson testified that S.W. said that S.W. and Kingcade had penis-to-vagina intercourse at his residence in 1991 when S.W. was approximately thirteen years old. According to the detective, S.W. did not remember some details and wanted to put the incident behind her.

¶13 Detective Johnson also testified that in 1992 police investigated whether Kingcade had sexually assaulted S.W. but that, because S.W. was uncooperative at the time, no charges were brought.

¶14 The State called Dr. Anna Salter as an expert witness. Dr. Salter has a Ph.D. in clinical psychology and public practice with a specialty in evaluating and treating both child sexual abuse offenders and victims. Salter testified about common patterns in child sexual abuse. In particular, Salter discussed the difficulty that victims of childhood sexual abuse have in coming forward at the time of their abuse, memory issues related to abuse, and common reasons that victims sometimes recant their abuse disclosure. Salter also defined what "grooming" means in the context of child sexual abuse.[1]

---

[1] Dr. Salter defined "grooming" as follows:

> [G]rooming is the phenomenon where someone treats a child as though they care about them. They give them things, they

(continued)

¶15    Kingcade was convicted on both counts.  He filed a postconviction motion seeking reversal on a number of grounds.  The circuit court held a hearing and denied Kingcade's request for postconviction relief.  The court also denied Kingcade's later motion for reconsideration.  This appeal follows.

## DISCUSSION

¶16    Kingcade raises the following three issues on appeal:  (1) his counsel was ineffective in numerous ways; (2) the prosecution failed to turn over exculpatory evidence in violation of **Brady**; and (3) several errors were so fundamentally unfair to his trial that we should reverse the circuit court's judgment in the interest of justice.  For the reasons set forth below, we reject Kingcade's arguments.

### I.  Ineffective Assistance of Counsel

¶17    The Sixth Amendment guarantees a criminal defendant the right to the effective assistance of counsel.  **Strickland v. Washington**, 466 U.S. 668, 685-86 (1984).  "Whether counsel's actions constitute ineffective assistance presents a mixed question of law and fact."  **State v. Tourville**, 2016 WI 17, ¶16, 367 Wis. 2d 285, 876 N.W.2d 735.  We uphold the circuit court's factual findings unless those findings are clearly erroneous, but we independently review whether counsel's conduct breached the defendant's right to effective assistance of counsel.  **State v. Jenkins**, 2014 WI 59, ¶38, 355 Wis. 2d 180, 848 N.W.2d 786.

---

shower attention on them, they listen to them; in some cases they take their side, advise with their parents.  They—they pretend to really care about these children, and the end result of that is the child gets attached to them.

6

¶18    A defendant raising an ineffective assistance of counsel claim must show:  (1) that counsel performed deficiently; and (2) that counsel's deficiency prejudiced the defendant.  *Strickland*, 466 U.S. at 687.  Counsel's performance is deficient only if counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.*  Courts apply this standard deferentially, and "'[c]ounsel need not be perfect, indeed not even very good, to be constitutionally adequate.'"  *State v. Thiel*, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305 (quoting *State v. Williquette*, 180 Wis. 2d 589, 605, 510 N.W.2d 708 (Ct. App. 1993)).

¶19    In order to show prejudice, a defendant bears the burden of proving that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.    Such a probability "exists when there is 'a "substantial," not just "conceivable," likelihood of a different result.'"  *State v. Cooper*, 2019 WI 73, ¶29, 387 Wis. 2d 439, 929 N.W.2d 192 (quoted source omitted).   When a defendant alleges that trial counsel made multiple errors, we consider whether the cumulative effect of the alleged errors was prejudicial.  *Thiel*, 264 Wis. 2d 571, ¶¶59-61.

¶20    Kingcade argues that his counsel was ineffective for:  (1) failing to investigate and present three witnesses who Kingcade asserts would have refuted F.F.'s testimony; (2) failing to investigate statements made by F.F. in connection with a homicide investigation; (3) failing to fully impeach F.F. with prior inconsistent statements; (4) failing to adequately question S.W. regarding her 1992

denials of sexual contact with Kingcade; and (5) failing to object to misstatements during opening and closing arguments by the prosecutor.[2]

¶21    We reject all of Kingcade's arguments because we conclude that he has failed to demonstrate that the alleged errors prejudiced his defense. Consequently, we need not address whether counsel's performance was deficient. *See State v. Mayo*, 2007 WI 78, ¶61, 301 Wis. 2d 642, 734 N.W.2d 115 (if a defendant fails to meet his or her burden under one prong of ineffective assistance of counsel, a court need not address the other prong).

### A. Failure to Investigate and Present Witnesses To Refute F.F.'s Testimony

¶22    Kingcade argues that his trial counsel was ineffective for failing to investigate and subsequently call three witnesses at his trial who he asserts would have refuted F.F.'s testimony:  (1) his daughter, Monica Davidson; (2) his former girlfriend and roommate, Sabrina Sido; and (3) Malik Clements, a basketball player who was coached by Kingcade and was the son of a woman Kingcade dated in the early to mid 2000s.  For the reasons set forth below, Kingcade fails to show that the absence of these witnesses from the trial prejudiced his defense.

---

[2] Kingcade also suggests that counsel was ineffective for failing to request a limiting instruction in response to a jury question.  Although Kingcade discusses the jury instruction issue in the context of his interest of justice claim (discussed below), he makes only brief reference to the issue in the context of ineffective assistance of counsel.  At no point does Kingcade apply the relevant ineffective assistance standards to the jury instruction issue.  Because this ineffective assistance claim is inadequately briefed, this court need not address it further. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).  We also note that Kingcade forfeited this ground for relief by failing to raise it in his postconviction motion, and we therefore reject any argument he intends to make based on this ground as well. *See State v. Van Camp*, 213 Wis. 2d 131, 144, 569 N.W.2d 577 (1997); *see also State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979) ("[I]t is a prerequisite to a claim of ineffective representation on appeal to preserve the testimony of trial counsel [because] [w]e cannot otherwise determine whether trial counsel's actions were the result of incompetence or deliberate trial strategies.").

### 1. Monica Davidson

¶23 Kingcade contends that his trial counsel's failure to investigate and call Kingcade's daughter, Monica Davidson, as a witness was ineffective because parts of Davidson's postconviction testimony contradicted parts of F.F.'s trial testimony. As with Kingcade's other ineffective assistance of counsel claims, we need not address whether his trial counsel performed deficiently because Kingcade has not shown that Davidson's omission from the trial prejudiced Kingcade's defense.

¶24 At the postconviction hearing, trial counsel testified that he did not call Davidson because Kingcade had told him that he did not want his daughter to be involved in the case. Counsel also testified that, although Davidson's testimony could have been helpful, it also had the potential to harm the defense. However, Kingcade argues that a defendant instructing his attorney not to contact a potential witness does not relieve the lawyer of the duty to investigate or call a witness and that failure to call Davidson was ineffective assistance. He contends that Davidson should have been called because Davidson would have contradicted F.F.'s testimony that (1) Davidson and F.F. were together at Kingcade's apartment and at the hotel where Kingcade worked; (2) Davidson called F.F.'s home for Kingcade; and (3) Davidson gave F.F. flowers when Davidson and Kingcade attended F.F.'s eighth grade graduation.[3]

---

[3] In her postconviction testimony, Davidson confirmed that she "[p]robably" attended F.F.'s graduation with Kingcade, but she denied that she gave F.F. flowers. In addition, Davidson did not explicitly testify that F.F. was never at the hotel, but stated that, when she stayed overnight at the hotel, she never saw F.F. there and that she did not recall whether she saw F.F. there with other basketball players.

¶25    The circuit court found that "Davidson's testimony was vague, equivocal and confused as to time and place of events," and that "[h]er testimony on cross examination contradicted her testimony on direct examination."  The court's conclusions are supported by the record.  The court also found that Davidson's testimony did not contradict F.F.'s testimony "in any material or relevant manner."  We agree with the court that any contradictions between Davidson's and F.F.'s testimony were not material or relevant insofar as they did not undermine the core of F.F.'s testimony—that Kingcade repeatedly sexually assaulted her over a period of years.  We are also persuaded by the State's argument that the value of Davidson's testimony would likely have been limited, given that Davidson is Kingcade's daughter and had a motive to testify favorably in his defense.

¶26    Moreover, as Kingcade's trial counsel indicated at the postconviction hearing, Davidson's absence at trial created a strategic advantage for the defense.  For example, during closing arguments, counsel seized on the State's decision not to call Davidson:

> Monica Davidson, they never went out and talked to Monica Davidson, who's Mr. Kingcade's daughter.  Why?  Why wouldn't they talk to her?
>
> She lived part-time with her father.  [F.F.] said she was constantly around.  She wasn't too young to testify or remember things.  She was eight to eleven years old.  Why didn't they go out and talk to her?  She's an adult now.  She could—she could tell what she remembered or what she didn't remember.
>
> [F.F.] testified that when she went to the hotel that Mr. Kingcade was working at, Monica Davidson went with them.  Okay.  So where is Monica Davidson when they're in the hotel room?  Is Monica Davidson in the room with them?  Is Monica Davidson out in the lobby of the hotel?  Where is Monica Davidson when supposedly they're in a hotel room together?

¶27 Under these circumstances, Kingcade fails to show that prejudice resulted from trial counsel's decision to comply with Kingcade's wishes by not calling Kingcade's daughter as a witness at trial.

### 2. *Sabrina Sido*

¶28 Kingcade argues that his trial counsel should have investigated and called his ex-girlfriend, Sabrina Sido, as a witness. At the postconviction hearing, trial counsel testified that, at the time of trial, he had reviewed the police report summarizing the investigator's interview with Sido and that he considered calling Sido as a witness, but that Kingcade asked him not to call her. The circuit court found trial counsel's testimony credible. Counsel also stated his belief that ex-girlfriends "don't turn out to be the best witnesses," and that Sido "certainly had more value not being there ... potentially than being there."

¶29 Kingcade focuses his argument on trial counsel's duty to conduct a prudent investigation into possible lines of defense. *See, e.g.*, **Jenkins**, 355 Wis. 2d 180, ¶¶40-66. However, failure to investigate will not in and of itself warrant a reversal for ineffective assistance of counsel—the defendant still needs to demonstrate that counsel's failure to investigate was prejudicial. *See id.*, ¶49. Under this standard, even if we were to assume that trial counsel should have investigated Sido's potential value in this case more than counsel testified that he did, Kingcade has not shown that Sido's absence from the trial was prejudicial.

¶30 As an initial matter, we note that Sido did not testify at the postconviction hearing, so all of Kingcade's appellate arguments are based on a police report detailing an investigator's interview with Sido. We nonetheless assume, in Kingcade's favor, that Sido's testimony would have accorded with the police report.

11

¶31 According to the police report, Sido stated that she and Kingcade were romantically involved and subsequently lived in the same apartment from late 1995 or early 1996 until she moved out in 1999 or 2000. While living together, the two broke up, but continued to live in the apartment as platonic roommates. Sido reported that she could not recall any time in which she was gone overnight from the apartment, and that Kingcade rarely spent the night away. Sido told police that she did not know who F.F. was and had no recollection of Kingcade bringing a female other than his daughter to the apartment. However, Sido also informed police that she was frequently gone from the apartment from 7:00 a.m. to 11:00 p.m. because she worked two to three jobs.

¶32 Kingcade argues that Sido's account, as detailed in the police report, contradicts F.F.'s testimony. He is incorrect.

¶33 While F.F. testified that Kingcade assaulted her at his apartment, F.F. also specifically stated that this happened after Sido moved out. F.F. testified that, because Kingcade was "hiding everything," there was never a time when Kingcade took F.F. to the apartment while Sido was there. Kingcade has likewise failed to show any inconsistency between Sido's testimony that Kingcade may have been occasionally absent from the apartment at night and F.F.'s testimony that she spent evenings at a hotel with Kingcade.

¶34 Kingcade also argues that Sido would have contradicted F.F.'s testimony about a brief conversation several years prior to trial that F.F. had at a party with Sido's younger sister, Katrina. F.F. testified that Katrina was rude to F.F. at the party and, when F.F. asked Katrina why, Katrina responded that F.F. had "taken her sister's boyfriend." F.F. testified that, when she pointed out to

Katrina that she was a child at that time and therefore any sexual relationship between her and Kingcade would have been sexual assault, Katrina apologized.

¶35     During Sido's 2016 interview, the detective informed Sido about the conversation between F.F. and Katrina that F.F. had reported.  In response, Sido laughed and said she did not know anything about that conversation, nor had she ever discussed with Katrina her relationship with Kingcade or why the relationship ended.

¶36     Again, we conclude that Kingcade has failed to show any contradiction between Sido's interview and F.F.'s testimony.  F.F. never testified that Katrina learned about Kingcade from Sido, and the evidence that many people were suspicious about Kingcade's relationship with F.F. during the relevant time period supports the inference that Katrina could have learned about the relationship from other sources.  Kingcade points to no evidence supporting a contrary inference.

¶37     In sum, Kingcade fails to show prejudice from trial counsel's failure to comply with Kingcade's directive not to call Sido as a witness at trial.

*3. Malik Clements*

¶38     Kingcade argues that trial counsel was ineffective for failing to call Malik Clements as a witness at trial.

¶39     Clements testified at the postconviction hearing as follows.  He first met Kingcade sometime in the early 2000s when Clements was seven or eight years old.  At the time, Kingcade was dating Clements' mother and, eventually, the two moved in together.  Kingcade and Clements' mother dated for approximately five years but, even after their relationship ended, Kingcade

continued coaching Clements in middle and high school athletics. During Clements' middle and high school years, he and Kingcade were extremely close. Clements' mother struggled financially, and his biological father was in jail. Kingcade was "like a dad" to Clements and for a time Clements "would go with [Kingcade] everywhere." Kingcade bought Clements a cell phone, basketball shoes, meals at "sit-down" restaurants, and other gifts. Kingcade continued to buy him things until Clements left to attend college in North Dakota, where Clements lived at the time of trial.

¶40 Kingcade argues that Clements' postconviction testimony undermined the State's theory that Kingcade groomed F.F. Specifically, he contends that Clements' testimony evidences Kingcade's tendency to be personally involved with many of the players he coached, not just with F.F.

¶41 The circuit court determined that Kingcade's treatment of Clements was "of little significance" because "[Clements] was a male and thus, likely not the object of [Kingcade's] urges and that [Clements] was a member of [Kingcade's] household and regarded [Kingcade] as his surrogate father." The record supports the circuit court's conclusion.

¶42 The record also supports the State's argument that Clements' testimony would have been cumulative of the testimony of another witness, Anthony Jones. Jones was Kingcade's long-time friend and a fellow youth basketball coach. At trial, Jones testified that he treated his players in many of the same ways that Kingcade did: he bought them things, gave them rides, and was personally involved in their lives. In other words, Kingcade had already established that, as a general matter, it was not unusual for community sports coaches to be personally involved with their players.

¶43    Based on the foregoing, Kingcade fails to show that Clements' absence at trial was prejudicial to Kingcade.

### B.  Failure to Investigate Statements Made by F.F. in Connection with a Homicide Investigation

¶44    Kingcade asserts that his trial counsel was ineffective for failing to investigate allegedly false statements made by F.F. in connection with a homicide investigation of her then-boyfriend in 2003.  We first provide the following pertinent background.

¶45    F.F. testified that the first time she told an adult about Kingcade's sexual abuse of her was in 2003, during an interview with Detective Rob Hale.  At the time, Hale was investigating the murder of Nathaniel Divine.  F.F.'s then-boyfriend, Takeith Tate, was eventually convicted of felony murder in the Divine case.

¶46    Hale testified that he interviewed F.F. in 2003 because her cell phone—the one that Kingcade had given her—showed repeated calls to Divine up until Divine's murder, whereupon the calls immediately stopped.  F.F. testified that, during the interview, Hale asked F.F. who Kingcade was, given that the cell phone was registered in his name, and that F.F. responded that Kingcade was "a guy that was molesting" her.  Hale testified that he did not report the allegation at the time of the interview because F.F. was then nineteen years old and she did not want to pursue charges.

¶47    F.F. testified that she was not ready to come forward with her allegations against Kingcade until approximately a decade after her 2003 conversations with Hale, after she had received counseling, moved to New York, and began working with children as a teacher.  F.F. testified that, at that time,

Annetta Wright called her to ask if it was okay for Wright's daughter (who F.F. used to babysit) to play on a basketball team coached by Kingcade. F.F. testified that she told Wright that it was not okay for Wright's daughter to play on a team coached by Kingcade, and that, when Wright asked why, F.F. told her what Kingcade had done to her. Wright testified that she prompted F.F. to write a letter about Kingcade's conduct, dated January 11, 2014, that was then turned over to school officials. Wright testified that, eventually, the letter made its way to police, who initiated an investigation and interviewed F.F. in 2015. Those interviews led to the current case.

¶48 During trial, Kingcade's counsel asked F.F. questions about her involvement in the Divine matter. Following an objection, the circuit court limited the questioning on this topic because it was a collateral matter. In closing, Kingcade's counsel argued that F.F. fabricated her allegation against Kingcade during her interview with Hale because: (a) she was angry at Kingcade for telling police that Tate was her boyfriend; and (b) she wanted to deflect attention away from her involvement in the Divine homicide.

¶49 Kingcade alleges here that trial counsel did not sufficiently investigate F.F.'s involvement in the Divine homicide matter or question F.F. about it during trial. Specifically, Kingcade notes that further investigation would have revealed that F.F. initially lied to investigators and played down her involvement with Tate and the Divine homicide. Kingcade argues that this would have provided additional impeachment evidence and demonstrated that F.F. had a motive to lie about Kingcade's abuse when she had her initial interview with Hale.

¶50 Kingcade's argument is misplaced. First, Kingcade's ability to present such evidence was limited because, as noted by the circuit court, F.F.'s

16

involvement in the Divine homicide trial was a collateral matter, *see **State v. Olson***, 179 Wis. 2d 715, 722-24, 508 N.W.2d 616 (Ct. App. 1993), and because, as noted by the State, Kingcade could not have introduced extrinsic evidence to impeach F.F. on collateral issues, *see **McClelland v. State***, 84 Wis. 2d 145, 159-61, 267 N.W.2d 843 (1978); WIS. STAT. § 906.08(2).[4]

¶51    However, even if Kingcade had adduced such additional evidence, he fails to show a reasonable probability that it would have affected the outcome of the trial.  The primary reason is that such evidence was cumulative to the evidence that Kingcade's trial counsel did elicit on this subject.  On cross-examination, Kingcade vigorously attacked F.F.'s credibility by linking her to the Divine homicide.  Later in the trial, Kingcade emphasized this again by questioning a detective about F.F.'s involvement in the homicide.  During arguments, Kingcade pressed his theory that F.F. had a motive to falsely accuse Kingcade to deflect attention away from herself and to punish Kingcade for pointing the finger at her boyfriend.  As the circuit court found:  "[T]he jury did get to consider the theory that F.F. made up these accusations to exact revenge upon him for his cooperation in identifying her boyfriend and his role in the ... homicide."

¶52    In sum, had Kingcade introduced the evidence he alleges was omitted by trial counsel, he fails to show that it would have made a difference in the outcome because it would have been cumulative to an argument already made.

---

[4] All references to the Wisconsin Statutes are to the 2017-18 version.

17

### C.  Failure to Fully Impeach F.F. with Prior Inconsistent Statements

¶53    Kingcade argues that trial counsel was ineffective for failing to impeach F.F. with a prior inconsistent statement that she made to police about the first sexual encounter she had with Kingcade.  Specifically, during the trial, F.F. testified that, when she and Kingcade were alone in a hotel room, Kingcade rubbed her breasts underneath her clothing.  In her statement to police, F.F. said that Kingcade had given her a back massage.

¶54    Kingcade fails to show that the inconsistency between F.F.'s testimony and her statement to police would have made any difference at trial.  This is not a case involving a single incident in a hotel room.  Rather, this case involved a lengthy sequence of abuse spanning years, including many acts of abuse occurring in a hotel room.  Kingcade does not show that trial counsel's failure to present a minor difference between two of F.F.'s statements about the first of those encounters prejudiced his defense.

### D.  Failure to Adequately Question S.W.

¶55    Kingcade contends that his trial counsel was ineffective for, as stated by the circuit court, "not vigorously cross examining S.W. as to [her] earlier statements to the police, where she denied being sexually assaulted by [Kingcade]."  The court determined that Kingcade failed to show that, had trial counsel done so, the outcome of the trial would have been different.  We agree.  Neither party directly asked S.W. whether Kingcade sexually assaulted her.  Instead, the State presented S.W.'s account through a detective who interviewed S.W. in 2015.  The detective testified that S.W. told her that Kingcade had sexually assaulted S.W. in 1991, while S.W. was still in middle school.  The

detective also testified that police investigated the assault in 1992, but that S.W. was uncooperative at the time.

¶56    S.W. testified that she did not recall her statements to the detective in 2015, and she did not recall police trying to talk to her in 1992 or being uncooperative during the 1992 investigation.  She also denied telling the detective that she had sexual intercourse with Kingcade.   During cross-examination, Kingcade's counsel asked whether S.W. felt coerced and manipulated into testifying, and S.W. responded that she did.

¶57    Kingcade contends that trial counsel should have questioned S.W. further about her denials in 1992.  Specifically, he notes that counsel had a copy of the 1992 investigation report that detailed S.W.'s three contemporaneous denials that Kingcade assaulted her.  At the postconviction hearing, Kingcade's counsel testified that he viewed S.W. as a favorable defense witness and that, if pressed, S.W. might change her testimony and say that the sexual assault actually occurred.

¶58    Kingcade has not met his burden of establishing prejudice.  As the circuit court reasoned:  (1) had S.W. affirmed those denials, the denials would be consistent with Dr. Salter's testimony about the reluctance of child sexual assault victims to report sexual assault and cooperate with law enforcement; (2) had S.W. not recalled the 1992 police interview, the defense could call the police officer to whom she made the denials but the end result would be the same as in scenario 1; and (3) had S.W. denied the denials, her accusations in 2015 would be affirmed. We agree with the circuit court's conclusion that, "when viewed against the totality of evidence presented at trial, it cannot be said that the outcome of this trial would have been different."

### E. *Failure to Object to Misstatements by the Prosecutor During Opening and Closing Arguments*

¶59    Kingcade argues that trial counsel was ineffective for not objecting to the prosecutor's misstatements during either opening or closing arguments. During opening and closing arguments, the prosecutor represented that S.W. told police in 1992 that Kingcade sexually assaulted her. In fact, there is no evidence that she made such a report at that time. Police initiated the 1992 investigation at the request of Dane County social services, not S.W. And, as we previously noted, in 1992 S.W. denied having been assaulted by Kingcade. S.W. did not inform police of the sexual assault until 2015.[5]

¶60    We conclude that Kingcade has not met his burden of establishing that the prosecutor's misstatements during arguments prejudiced Kingcade. As noted by the circuit court, the jury heard evidence that police closed the investigation related to S.W. in 1992 because they did not have a witness willing to accuse Kingcade of a crime. Detective Johnson testified that S.W. informed Johnson that S.W. did not cooperate in 1992 because she was afraid of getting in trouble, was flattered by the attention, and did not think it was a "big deal." The jury learned that S.W.'s viewpoint changed in 2015. Kingcade fails to show that pointing out that S.W. informed police of the conduct in 2015 rather than in 1992 would have changed the verdicts.

¶61    Finally, the court instructed the jury that "remarks of the attorneys are not evidence" and that, "[i]f the remarks suggested certain facts not in

---

[5] The circuit court found that "[n]othing in the record supports the notion that the state intentionally attempted to deceive the jury by its erroneous argument." To the extent Kingcade suggests that the misrepresentations were intentional, he does not support such an assertion.

20

evidence, [the jury should] please disregard the suggestion." The court further instructed that closing arguments, conclusions, and opinions are not evidence, and that the jury was to decide the case and base its verdict solely on the evidence received at trial. A jury is presumed to follow instructions given them. *See **State v. Johnston***, 184 Wis. 2d 794, 822, 518 N.W.2d 759 (1994).

### F. Cumulative Effect of Claimed Deficiencies

¶62     Multiple errors by counsel may prejudice a defendant even when no single error does so independently. *See **Thiel***, 264 Wis. 2d 571, ¶¶59-61. However, it is also true that, "in most cases errors, even unreasonable errors, will not have a cumulative impact sufficient to undermine confidence in the outcome of the trial, especially if the evidence against the defendant remains compelling." *Id.*, ¶61. Here, we conclude that Kingcade suffered no prejudice because, even considering all of trial counsel's alleged errors in the aggregate, Kingcade has not shown a substantial likelihood of a different outcome, particularly given the significant evidence against him at trial.

### II. *Brady Violation*

¶63     Criminal defendants have a due process right to favorable evidence in the State's possession. ***Brady v. Maryland**, 373 U.S. 83, 87 (1963).* When this court is presented with an alleged ***Brady*** violation, we accept the circuit court's findings of historical fact unless those findings are clearly erroneous, but we review de novo whether a due process violation occurred. ***State v. Wayerski***, 2019 WI 11, ¶35, 385 Wis. 2d 344, 922 N.W.2d 468.

¶64     To show that a ***Brady*** violation has occurred, a defendant must prove that: (1) the evidence at issue is favorable to the accused; (2) the evidence was

suppressed by the State, either willfully or inadvertently; and (3) the evidence was material. *Wayerski*, 385 Wis. 2d 344, ¶35. The test for materiality is identical to the prejudice prong of an ineffective assistance of counsel claim under *Strickland*. *Wayerski*, 385 Wis. 2d 344, ¶36.

¶65 In this case, Kingcade argues that the State committed a *Brady* violation when the State failed to disclose the extent of F.F.'s involvement with—and lies about—the Divine homicide. Kingcade's postconviction theory is that the defense could have used the missing information about the Divine homicide to comprehensively impeach F.F. This, he argues, was material to the case.

¶66 We disagree. In reaching this conclusion, we assume without deciding that Kingcade has made a sufficient showing under both elements (1) and (2) of *Brady*. The problem for Kingcade is that he fails to show that the evidence in question was "material" to the case for the same reasons that he has not shown that its omission was "prejudicial" under his ineffective assistance of counsel argument. These reasons are explained in our discussion above and are not repeated here.

### III. Reversal in the Interest of Justice

¶67 Kingcade's final argument is that we should reverse his convictions in the interest of justice. This court has discretionary statutory authority to reverse judgments if either the "real controversy has not been fully tried" or the trial has resulted in a miscarriage of justice. WIS. STAT. § 752.35. We exercise that power sparingly and only in exceptional cases. *See State v. Wery*, 2007 WI App 169, ¶21, 304 Wis. 2d 355, 737 N.W.2d 66; *State v. McKellips*, 2016 WI 51, ¶52, 369 Wis. 2d 437, 881 N.W.2d 258.

22

¶68    Kingcade argues for a reversal only under the real-controversy-has-not-been-fully-tried facet of our discretionary reversal power, so we limit our discussion to that standard.

¶69    Kingcade raises two issues that he contends warrant a reversal in the interest of justice. First, he argues that the State's improper arguments during opening and closing amounted to "prosecutorial misconduct." Second, he argues that the circuit court erred in instructing the jury. Because we conclude that neither of these issues prevented the real controversy from being fully tried, we will not reverse the circuit court.

¶70    We turn first to the alleged prosecutorial misconduct. As we have already discussed, during opening and closing arguments the prosecutor incorrectly stated that S.W. told police in 1992 that Kingcade sexually assaulted her. In fact, in 1992 S.W. had denied to police that she was assaulted, and did not inform police of the assault until 2015. Kingcade's trial counsel did not object to the prosecutor's misstatements.

¶71    We disagree with Kingcade that the prosecutor's misstatements warrant discretionary reversal. When, as here, a defendant claims that allegedly improper arguments prevented the real controversy from being fully tried, we look to the entire record to ascertain whether those arguments "so infected the jury that a new trial must be had." *See State v. Bvocik*, 2010 WI App 49, ¶13, 324 Wis. 2d 352, 781 N.W.2d 719; *State v. Weiss*, 2008 WI App 72, ¶¶16-17, 312 Wis. 2d 382, 752 N.W.2d 372. Applying this standard, for the same reasons that we concluded that Kingcade failed to show prejudice during our ineffective assistance of counsel analysis, we conclude that the State's misstatements did not prevent the real controversy from being fully tried in this case.

¶72    Kingcade's other ground for a reversal in the interest of justice is the circuit court's failure to give a limiting instruction to the jury in response to the jury's question. During deliberations, the jury asked: "Can our findings of fact in one charge be used as a pattern of behavior applicable to the second charge?" The circuit court proposed a response, to which trial counsel objected. After noting that the charges had been joined for trial, the court asked trial counsel if he had a better response to the jury's question. Counsel responded that he did not believe the charges should have been joined and that he had filed a motion to sever the charges. The court noted that it had denied the motion.[6] After further discussion, the court modified its original response, proposing the following response instead:

> All of the evidence introduced during the course of this trial can be considered as you evaluate each of the criminal charges.
>
> It is for you to determine whether the defendant is guilty or not guilty of each of the offenses charged. You must make a finding as to each count of the information. Each count charges a separate crime, and you must consider each one separately. Your verdict for the crime charged in one count must not affect your verdict on any other count.

Following the court's recitation of this proposed instruction, defense counsel responded, "Correct." Counsel proposed no additional modification or limiting instruction, and the jury was provided the response set forth above.

---

[6] The circuit court allowed joinder of the counts because the court held that evidence from one count would have been admissible as evidence of Kingcade's method of operation, which was common to both allegations. Specifically, the court found that Kingcade's alleged method of operation was (a) using his position in the school district, (b) to groom girls, (c) who were adolescents, (d) lacking in parental oversight, (e) so that he could later have penis-to-vagina intercourse with them. Kingcade does not appeal the circuit court's joinder ruling.

24

¶73    On appeal, Kingcade contends that the jury's question—and specifically the language referencing a "pattern of behavior"—demonstrates that the jury was considering using F.F.'s testimony as character or propensity evidence, in violation of WIS. STAT. § 904.04 and *State v. Sullivan*, 216 Wis. 2d 768, 783, 576 N.W.2d 30 (1998).  As a result, Kingcade argues, the circuit court should have given the jury a limiting instruction, namely, the "other conduct" instruction, WIS JI—CRIMINAL 275,[7] even though counsel did not request this

---

[7] This pattern jury instruction provides, in pertinent part:

> **275 CAUTIONARY INSTRUCTION:    EVIDENCE OF OTHER CONDUCT [REQUIRED IF REQUESTED] § 904.04(2)(a)**
>
> **Evidence Presented**
>
> Evidence has been presented regarding other conduct of the defendant for which the defendant is not on trial.
>
> Specifically, evidence has been presented that the defendant (describe conduct).  If you find that this conduct did occur, you should consider it only on the issue(s) of [CHOOSE ONLY THOSE THAT APPLY] (motive) (opportunity) (intent) (preparation or plan) (knowledge) (identity) (absence of mistake or accident) (context or background) (identify other issue).
>
> You may not consider this evidence to conclude that the defendant has a certain character or a certain character trait and that the defendant acted in conformity with that trait or character with respect to the offense charged in this case.
>
> ....
>
> You may consider this evidence only for the purpose(s) I have described, giving it the weight you determine it deserves.  It is not to be used to conclude that the defendant is a bad person and for that reason is guilty of the offense charged.

WIS JI—CRIMINAL 275 (footnotes omitted).

instruction. According to Kingcade, the evidence against him with respect to S.W. was so slight that failure to give this instruction was dispositive.

¶74 Kingcade's arguments are undeveloped and unconvincing. Even assuming the jury's question implicated the type of character or propensity evidence barred by WIS. STAT. § 904.04, Kingcade fails to show that a limiting instruction was required where, as here, the two counts were joined for trial (a determination that Kingcade does not appeal). Notably, the jury instruction that he argues should have been provided, WIS JI—CRIMINAL 275, states that the instruction is given in cases where evidence was presented regarding other conduct "*for which the defendant is not on trial*" (emphasis added).

¶75 Moreover, Kingcade has not demonstrated why the circuit court's response was inadequate. The court informed the jury that it "must make a finding as to each count of the information," that "[e]ach count charges a separate crime, and [the jury] must consider each one separately," and that the jury's "verdict for the crime charged in one count must not affect [the jury's] verdict on any other count." Indeed, Kingcade does not argue that trial counsel performed ineffectively by stating "correct" when the court read the proposed response and by failing to propose any further alternatives.

¶76 In sum, Kingcade fails to demonstrate that the omission of a limiting instruction prevented the real controversy from being fully tried.

## CONCLUSION

¶77 For the reasons stated above, we affirm the judgment and orders of the circuit court.

26

*By the Court.*—Judgment and orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.