COURT OF APPEALS
DECISION
DATED AND FILED

November 4, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2018AP1726-CR**

Cir. Ct. No. 2015CF58

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT II**

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

 V.

BRIAN S. O'TOOLE,

  DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Walworth County:  DAVID M. REDDY, Judge.  *Affirmed*.

Before Neubauer, C.J., Reilly, P.J., and Gundrum, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. Brian S. O'Toole appeals from a judgment convicting him of first-degree sexual assault of a child, as a persistent repeater, and an order denying his postconviction motion. O'Toole argues that the circuit court: (1) erroneously exercised its discretion in admitting other-acts evidence of a prior sexual assault and a restraining order, (2) improperly allowed the jury to use the other acts as evidence of O'Toole's propensity to commit sexual assaults, and (3) made erroneous evidentiary rulings at trial. O'Toole also argues that application of the greater latitude rule to the prejudice prong of the court's other-acts analysis violated his due process right to a fair trial, and that the prosecutor's closing arguments improperly shifted and lowered the applicable burden of proof. For the reasons that follow, we affirm.

## BACKGROUND

¶2    In 2015, O'Toole was charged with one count of repeated acts of sexual assault against the same child victim, contrary to WIS. STAT. § 948.02(1) (2017-18),[1] and WIS. STAT. § 948.025(1)(d). The complaint alleged that during the 2014-15 school year, O'Toole repeatedly fondled the genitalia of his twelve-year-old stepdaughter, H.M.F. H.M.F. reported that about two to three times per week, O'Toole would ask her to lie in bed with him. Wearing only his underwear, he would rub her stomach and touch her vagina underneath her clothing while kissing her cheek.

¶3    O'Toole had a prior Illinois conviction for sexually assaulting his biological daughter, D.M.O., in 2005, when she was fifteen years old. The State

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

twice moved to admit O'Toole's assaults on D.M.O. as other-acts evidence in the instant trial. [2] At two separate hearings, the circuit court determined that given the similarities between the D.M.O. and H.M.F. assaults, and in light of the greater latitude rule, evidence of the Illinois assaults was relevant and admissible to prove O'Toole's motive and intent to assault H.M.F., pursuant to WIS. STAT. § 904.04(2)(a) (general admissibility); and (2)(b)1. (greater latitude rule applies to alleged violations of ch. 948).

¶4      H.M.F. testified that O'Toole sexually assaulted her for a "couple years." After school, while her mom was at work, O'Toole, clad only in his underpants, would sexually assault her in his bed. The sexual activity involved cuddling and touching her, both over and under her clothing, on her breasts, buttocks and vagina, and kissing her on the mouth. At times, O'Toole would rub his penis against her back and tell her that her "boobs" and "butt" were getting larger. H.M.F. said this activity "confused" her, and that O'Toole told her not to tell her mother because she would be "jealous." H.M.F. reported the assaults to her mother and then to Jeanne Engerson, a school guidance counselor. As a mandatory reporter, Engerson contacted the County.

¶5      Consistent with the circuit court's other-acts ruling, D.M.O. testified that she became estranged from her mother and came to live with O'Toole, his then-wife, L.N., and their two children in Illinois in 2005. She was fourteen or fifteen years old. D.M.O. said that she and her father quickly moved from becoming friends to intimacy and this made her "uncomfortable." The

---

[2] The State filed an original and a supplemental motion to admit other-acts evidence. The supplemental motion contained additional evidence concerning the Illinois assaults but did not substantially alter the scope of the circuit court's original other-acts ruling.

relationship quickly escalated to touching, caressing, kisses on the lips, and sexual intercourse. She testified that O'Toole would caress her intimate parts both over and under her clothing, and that this led to multiple acts of oral sex and intercourse. D.M.O. testified that, while she loved O'Toole, she was also "terrified" by what he was making her do.

¶6 O'Toole's then-wife, L.N., testified that she saw the relationship between her husband and D.M.O. grow into one that involved hugging, kissing and touching. L.N. told O'Toole she did not think it was "healthy." O'Toole told L.N. she was just "jealous."

¶7 In September 2005, O'Toole's niece caught O'Toole engaged in a sexual act with D.M.O. O'Toole took D.M.O. out of school to discuss what had happened. L.N. was at home. O'Toole told L.N. that her "worst fears came true" and that he was going to turn himself in because "he needed help."

¶8 O'Toole told D.M.O. he was going to have to tell the police about their relationship. D.M.O. testified that he told her to give police the "mild" version of what they did; there was touching but no intercourse. D.M.O. followed O'Toole's instructions and gave a "childish, and very mild" version to police both because she was "scared" and because she did not want to lose him. She told police, "I need my dad." D.M.O. testified that she stayed in contact with O'Toole while he was in prison and they exchanged "love letters," but that she did not want contact with O'Toole after he got out. She obtained a restraining order to prevent O'Toole from contacting her.

¶9 Illinois Police Officer Barry Portman testified that O'Toole turned himself in for having a "relationship with his daughter" and wanted "some help." O'Toole told Portman he and his daughter were lying in bed watching a movie,

4

they began to wrestle, and he "found his hand on her breast." O'Toole said he touched D.M.O. "all over her body" and caressed her. They went into her room where they kissed, removed their clothing below the waist, and simulated sexual intercourse. O'Toole admitted that he got on top of D.M.O., thrust his hips, and rubbed his penis on her vagina for several minutes. He told her she was "very well developed." O'Toole also admitted to Portman that he touched his daughter's clitoris. O'Toole said D.M.O. was "submissive" and he was "erect."

¶10 O'Toole testified and denied sexually assaulting or inappropriately touching H.M.F. O'Toole admitted that he told H.M.F. her mother would be "jealous," but only because he spent so much time playing with the children. O'Toole explained that H.M.F. falsely accused him because she was mad at him for not letting her see boys and for grounding her. It all came to a head, O'Toole said, when he drove her to school on February 10, 2015, and told her he knew that she had sent nude photos of herself to a boy at school. O'Toole told her that he was not happy about it, and they would discuss it when she got home that night. O'Toole testified that H.M.F. got mad, slammed the car door, told him "I don't want to talk about this with you," and stomped off to school where she immediately reported the assaults to Engerson.

¶11 With regard to D.M.O., O'Toole said that he fell in love with her and this led to inappropriate touching in 2005. He admitted that L.N. told him she thought his relationship with D.M.O. was not healthy and, in response, he told L.N. she was just "jealous." O'Toole said he turned himself in because he had failed D.M.O. and to "get help." O'Toole denied that he told D.M.O. to lie to police or to minimize what happened. He testified that he only touched D.M.O.'s breast "that one night." He did not contest D.M.O.'s restraining order.

¶12    The jury found O'Toole guilty and the court imposed a life sentence as mandated by statute.

¶13    O'Toole filed a postconviction motion asking the circuit court to reconstruct an unrecorded portion of the jury instructions conference concerning WIS JI—CRIMINAL 275, "Cautionary Instruction:  Evidence of Other Conduct" under WIS. STAT. § 904.04(2)(a).  The postconviction motion also challenged the circuit court's modifications to JI-275, and argued that the "greater latitude rule," favoring the admissibility of other-acts evidence in child sexual assault cases, violates due process when it is applied to the task of balancing probative value against unfair prejudice.  After a postconviction hearing, the court found that O'Toole had preserved his arguments challenging the modification of JI-275, but denied his claims for relief.  O'Toole appeals.

## DISCUSSION

A. *The Circuit Court Properly Exercised its Discretion in Admitting Other-Acts Evidence.*

¶14    O'Toole argues that the circuit court erroneously exercised its discretion in admitting evidence of his prior sexual assaults of D.M.O., and of D.M.O.'s restraining order.  Though character evidence is generally not admissible to show that the person acted in conformity therewith,[3] evidence of a person's other crimes, wrongs or acts may be admitted for certain purposes, such as to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.  *See* WIS. STAT. § 904.04(2)(a).  In determining

---

[3] Such character evidence is also referred to as propensity evidence.

whether other acts are admissible, courts employ a three-part test: (1) the evidence must be offered for an acceptable purpose, (2) the evidence must be relevant, and (3) its probative value must not be substantially outweighed by the danger of unfair prejudice. *See State v. Sullivan*, 216 Wis. 2d 768, 772-73, 576 N.W.2d 30 (1998). In child sexual assault cases, greater latitude is afforded the admissibility of other-acts evidence. *State v. Davidson*, 2000 WI 91, ¶51, 236 Wis. 2d 537, 613 N.W.2d 606.[4] "[T]he greater latitude rule applies to the entire analysis of whether evidence of a defendant's other crimes was properly admitted at trial." *Id*. "The effect of the rule is to permit the more liberal admission of other crimes evidence in sex crime cases in which the victim is a child." *Id*.

¶15    The decision whether to admit or exclude other-acts evidence is left to the circuit court's sound discretion. *State v. Hunt*, 2003 WI 81, ¶34, 263 Wis. 2d 1, 666 N.W.2d 771. We will uphold its evidentiary ruling if the court "examined relevant facts, applied a proper standard of law, used a demonstrated rational process, and reached a conclusion that a reasonable judge could reach." *Id*.

¶16    We conclude that the circuit court properly admitted the other-acts evidence concerning O'Toole's prior assaults of D.M.O. to prove motive and intent. O'Toole does not challenge the court's application of the first two *Sullivan* prongs, but argues that the court erroneously exercised its discretion in ruling that the acts were not unduly prejudicial. According to O'Toole's appellate brief, the circuit court's analysis "consisted of an observation that 'the greater latitude rule in sex crimes is something that applies to all three prongs of the *Sullivan* analysis,

---

[4] The greater latitude rule is codified at WIS. STAT. § 904.04(2)(b)1.

and so it would apply to this as well,'" along with statements that O'Toole was able to cross-examine D.M.O. and would receive a cautionary instruction.

¶17 We disagree with O'Toole's assertion that the circuit court's analysis of the prejudice prong was insufficient. O'Toole cites to the court's comments at the second hearing on the State's supplemental other-acts motion, and omits any reference to the first other-acts hearing, at which the circuit court went through its analysis on the record:

> Thank you. Looking again at *Hurley*. Paragraph 87, it talks about the probative value of evidence is a function of its relevance under Wisconsin Statute 904.01. Essentially, probative value reflects the evidence's degree of relevance. Evidence that is highly relevant has great probative value, whereas evidence that is only slightly relevant has low probative value. If the probative value is close to or equal to its unfair prejudicial effect, the evidence must be admitted. The court is going to find this evidence to be highly relevant. And, therefore, the probative value is not substantially outweighed by the danger of unfair prejudice.

The court's analysis constitutes a demonstrably proper exercise of discretion. The other acts were prejudicial because they were so highly probative.

¶18 We also reject O'Toole's argument that application of the greater latitude rule to *Sullivan's* prejudice prong violates his due process right to a fair trial. The Wisconsin Supreme Court has held otherwise. *See, e.g., State v. Hurley*, 2015 WI 35, ¶59, 361 Wis. 2d 529, 861 N.W.2d 174; *State v. Marinez*, 2011 WI 12, ¶16, 331 Wis. 2d 568, 797 N.W.2d 399; *Davidson*, 236 Wis. 2d 537, ¶51. Only the supreme court can modify or overrule previous supreme court decisions. *Cook v. Cook*, 208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997). We are bound to follow these holdings, and will not address this argument further.

¶19     O'Toole also argues that the circuit court erroneously exercised its discretion in admitting evidence that D.M.O. obtained a restraining order against O'Toole.  The State argues that O'Toole has forfeited review of this issue by failing to raise an objection in the circuit court.  We agree.  Trial counsel told the court he had no objection to receiving the restraining order into evidence.  Though O'Toole's reply brief suggests that he raised a specific pretrial objection to the restraining order evidence, the record does not bear this out.[5]

### B. The Other-Acts Evidence Was Not Admitted or Used as Evidence of O'Toole's Character or Propensity.

¶20     O'Toole suggests that the circuit court improperly allowed the jury to consider the D.M.O. sexual assaults as evidence of O'Toole's propensity to commit similar crimes, here, the assault of H.M.F.  He argues that the court misapplied WIS. STAT. § 904.04(2)(b)2., which provides a limited exception to the general rule prohibiting propensity evidence, as follows:

> In a criminal proceeding alleging a violation of s. … 948.02(1), sub. (1) and par. (a) do not prohibit admitting evidence that a person was convicted of a violation of s. … 948.02(1) or a comparable offense in another jurisdiction, that is similar to the alleged violation, as evidence of the person's character in order to show that the person acted in conformity therewith.

In support of his argument, O'Toole points to the circuit court's ruling that the offenses were "comparable" under § 904.04(2)(b)2., and its decision to slightly modify WIS JI—CRIMINAL 275.

---

[5] We also question whether the fact of D.M.O. obtaining a restraining order constitutes other acts of the *defendant* subject to the analysis of WIS. STAT. § 904.04(2).

¶21    We are not persuaded.    The central problem with O'Toole's argument is that the jury was never asked or instructed to consider the other acts as character or propensity evidence.  Though O'Toole himself successfully obtained the admission of his Illinois conviction, the circuit court did not instruct the jury that, pursuant to WIS. STAT. § 904.04(2)(b)2., it could consider the conviction "as evidence of [O'Toole's] character in order to show that [O'Toole] acted in conformity therewith."    *Id*.; WIS JI—CRIMINAL 276 ("Prior Conviction Admissible to Prove Character.").[6]

¶22    In fact, the State explicitly and affirmatively informed the court and O'Toole that it would not use the other-acts evidence to argue propensity.  The record shows that the State consistently argued that the other-acts evidence showed O'Toole's motive and intent in assaulting H.M.F.

¶23    Additionally, the circuit court instructed the jury, consistent with WIS. STAT. § 904.04(2)(a), that it could consider the other-acts evidence on the issues of motive and intent, stating:

> Evidence has been presented regarding other conduct of the defendant for which the defendant is not on trial.  Specifically, evidence has been presented that the defendant had sexual contact and sexual intercourse with

---

[6] As to the fact of the conviction, consistent with WIS. STAT. § 906.09, the circuit court instructed the jury as follows:

> Evidence has been received that the defendant, Brian S. O'Toole, has been convicted of a crime.  The evidence was received solely because it bears upon the credibility of the defendant as a witness.  It must not be used for any other purpose, and, particularly, you should bear in mind that a criminal conviction at some previous time is not proof of guilt of the offense now charged.

WIS JI—CRIMINAL 327.

> [D.M.O.]. You may find that this conduct did occur. You may consider it on the issue of motive—I'm sorry. If you find that this conduct did occur, you may consider it on the issue of motive; that is, whether the defendant had a reason to desire the result of the offense charged; and intent, that is, whether the defendant acted with the state of mind that is required for the offense charged.
>
> You may consider this evidence for the purposes I have described, giving it the weight you determine it deserves. It is not to be used to conclude that the defendant is a bad person and for that reason is guilty of the offense charged.

The court did not invite the jury to consider the other-acts evidence for impermissible purposes.

¶24 O'Toole makes much of the fact that the circuit court exercised its discretion to modify the standard other-acts jury instruction by removing the word "only" and omitting what he calls the "anti-propensity" language.[7] According to O'Toole, the modified instruction allowed the jury to consider the conduct underlying his assaults of D.M.O. as propensity evidence.

¶25 We disagree. The circuit court's language affirmatively instructed the jury to consider the other-acts evidence on the issues of motive and intent, and told the jury it could not use it to conclude that O'Toole was a bad person. In no way did the instruction sanction the use of the other acts as character or propensity evidence. Given the parties' disagreement over whether the fact of the Illinois

---

[7] The standard instruction provides that the jury may consider the other-acts evidence "*only* on the issue(s)" for which it was admitted, here, motive and intent. *See* WIS JI—CRIMINAL 275 (emphasis added). The standard instruction also includes the following, which O'Toole refers to as "anti-propensity language": "You may not consider this evidence to conclude that the defendant has a certain character or a certain character trait and that the defendant acted in conformity with that trait or character with respect to the offense charged in this case." *Id*.

conviction could be used as propensity evidence under WIS. STAT. § 904.04(2)(b)2., the court properly exercised its discretion by deciding *not* to read WIS JI—CRIMINAL 276, which would have permitted the jury to consider the Illinois conviction as propensity evidence, and to modify WIS JI—CRIMINAL 275 in a way that did not materially alter its cautionary value.

## C. O'Toole is Not Entitled to a New Trial Based on the Circuit Court's Evidentiary Rulings at Trial.

¶26 O'Toole complains that he is entitled to a new trial because the circuit court erroneously prevented him from cross-examining Deborah Ewoldt, and because it erroneously admitted hearsay testimony from Engerson that bolstered H.M.F.'s credibility. We reject both claims.

### 1. Ewoldt Testimony

¶27 Social worker Ewoldt was assigned to investigate H.M.F.'s allegations, and she met with O'Toole at his home on the afternoon of February 10, 2015. Ewoldt testified that O'Toole told her he had "never done anything inappropriate" with D.M.O., and "that he only admitted to this and pled guilty" to avoid losing his children, and so that D.M.O. would not have to testify.

¶28 On cross-examination, O'Toole attempted to elicit from Ewoldt that he denied having "inappropriately touched" H.M.F. The State objected on hearsay grounds, and O'Toole asserted that Ewoldt's trial testimony was inconsistent with her written report, which said that O'Toole "stated he had never done anything inappropriate" with H.M.F., and that he "admitted to touching [D.M.O.'s] breasts over clothing." Trial counsel argued that Ewoldt's testimony misled the jury by suggesting that O'Toole took no responsibility for assaulting D.M.O., when

12

Ewoldt's report (1) actually used the phrase "inappropriate" in referencing his statements about H.M.F., and (2) said he admitted to touching D.M.O.'s breasts over clothing. Trial counsel argued that portions of Ewoldt's report were admissible as prior inconsistent statements or under the rule of completeness. After considering the parties' offers of proof and arguments, the circuit court sustained the hearsay objection, determining that a fair interpretation of Ewoldt's testimony was that O'Toole's denials were in direct response to questions about D.M.O. and that there was no "distortion to the extent that it invokes the rule of completeness."

¶29     As with other discretionary determinations, this court will uphold a circuit court's decision to admit or exclude evidence if the circuit court examined the relevant facts, applied a proper legal standard, and reached a reasonable conclusion using a demonstrated rational process. *State v. Muckerheide*, 2007 WI 5, ¶17, 298 Wis. 2d 553, 725 N.W.2d 930.

¶30     The circuit court reasonably exercised its discretion in sustaining the State's hearsay objection. The court determined that Ewoldt's testimony related to O'Toole's statements about D.M.O. and that just because the word "'inappropriate' was used during that questioning does not mean that [O'Toole] can point to another portion of the report that has the same word." Additionally, though the report says that O'Toole "admitted to touching [D.M.O.'s] breasts over clothing," the next sentence is: "[O'Toole] states he only admitted to this and pled guilty because 'they' told him his children would be taken away and his daughter would have to testify if he didn't." In this context, eliciting from Ewoldt that she wrote in her report that "O'Toole admitted to touching [D.M.O.'s] breasts over clothing" is not necessary to present a complete and accurate story to the jury.

¶31    Further, any error was harmless.  We observe that O'Toole, himself, testified that he never told Ewoldt he had touched D.M.O.s breasts over her clothing.  But even if O'Toole had told Ewoldt that he touched D.M.O.'s breasts over clothing, his extreme minimization of his sexual activity with D.M.O. in 2005 is tantamount to a denial of any wrongdoing or inappropriate contact.  Had counsel explored this "inconsistency" on cross-examination of Ewoldt, it would not have gotten him far and, as set forth in the State's brief, her report would have greatly damaged the defense.  It is for this reason that trial counsel made it clear he did not want the substance of the report entered into evidence.

### 2. Engerson's Testimony About M.O.'s Remarks to H.M.F.

¶32    H.M.F. testified that the first person she told about the assault was her mother, M.O., and that Engerson, her guidance counselor, was the second. She testified that when she told her mother about the sexual assault, M.O. told her to "go back upstairs."  H.M.F. said that she loves her mother but they had argued a lot because H.M.F. knew that M.O. loved O'Toole and did not want to believe that her husband could do something like this.  This made H.M.F. "mad" because she wanted M.O. to believe her.  H.M.F. testified that her birthday was about one week after she reported the assaults and that M.O. decided not to have a birthday party for her.  According to H.M.F., M.O. told her that even if O'Toole did these things, M.O. was not going to leave him, and he would remain part of the family.

¶33    H.M.F. stayed with her mother the night of February 10 through February 11, after she initially reported the assaults to Engerson at school.  H.M.F. testified that on February 11, after spending the night with her mother, she told Engerson she considered recanting because she did not want to ruin her mother's and O'Toole's lives, and she was worried about the effect her accusations would

14

have on her family. When asked if she told Engerson about other statements her mother made, H.M.F. said, "I don't remember."

¶34 Engerson testified that, when H.M.F. initially reported the assaults on February 10, she said she already told her mother who, in turn, told her not to talk to any adults. Over O'Toole's hearsay objection, the circuit court allowed Engerson to testify that H.M.F. told her on February 11 that her mother told her the night before that she hated her, she would never forgive her, this would ruin O'Toole's life, and that H.M.F. was partially at fault because she did not say "no." Engerson testified that H.M.F. said M.O. told her to lie and make it sound as if what O'Toole did was not so bad, in hopes that it would result in a lesser sentence. Engerson testified that when H.M.F. came to her office at 8:03 a.m. on February 11, she appeared to be "stressed."

¶35 The circuit court ruled that H.M.F.'s statements to Engerson on February 11 about what her mother said to her the night before were not hearsay. They were not offered to prove the truth of what M.O. said to H.M.F., but were offered to prove their effect on H.M.F. The court also determined that these were nonhearsay prior inconsistent statements that became admissible when H.M.F. repeatedly testified she could not recall making them.

¶36 O'Toole maintains that the circuit court erred in allowing Engerson to testify about what M.O. purportedly said to H.M.F. We disagree and conclude that the court properly exercised its discretion in admitting the statements to show H.M.F.'s state of mind. *See State v. Wilson*, 160 Wis. 2d 774, 779, 467 N.W.2d 130 (Ct. App. 1991). M.O.'s statements were properly received through Engerson because their effect on H.M.F. was immediately obvious to Engerson the next morning. H.M.F. had reported the assaults to Engerson the day before. She

15

returned to see Engerson on her own, unannounced, the next day after spending the night with her mother. Engerson described H.M.F. as appearing "stressed." H.M.F., needing to talk to someone about how her mother reacted to her accusations the day before, immediately disclosed to Engerson. Despite O'Toole's assertion that the statements were inadmissible "double hearsay," it is clear that M.O.'s statements were not offered to prove the truth of what she said. They were not hearsay. WIS. STAT. § 908.01(3). [8]

¶37 Further, the circuit court properly exercised its discretion in ruling that what H.M.F. said to Engerson was inconsistent with her trial testimony that she could not recall her mother making the statements. *See* WIS. STAT. §§ 908.01(4)(a)1. and 972.09. It was reasonable for the court to believe that H.M.F.'s lack of recall was due more to her reluctance to blame her mother than to fading memory.

¶38 Finally, any error in admitting Engerson's testimony was harmless. H.M.F. had already testified that M.O. did not believe her and became angry when H.M.F. told her about the assaults. H.M.F. said that they argued and M.O. told her not to talk to any adults about it. M.O. told her she could not have a birthday party. H.M.F. had also testified that she felt pressured to lie or recant. For example, she testified that on February 11, M.O. told her that if O'Toole had to

---

[8] We also reject O'Toole's argument that the testimony improperly bolstered H.M.F.'s credibility. First, O'Toole has not established that this issue was raised in and considered by the circuit court. Second, we agree with the argument in the State's brief that O'Toole had already attacked H.M.F.'s credibility.

16

leave the home, there would be financial difficulties and she might go into a deep depression. Engerson's statements were cumulative to H.M.F.'s own testimony.

*D. The Prosecutor's Closing Arguments Did Not Shift or Lower the Burden of Proof.*

*1. Sex Offender Treatment Records.*

¶39    O'Toole testified that he participated in sex offender treatment with a Dr. Leo Meagher while serving his Illinois sentence. In closing argument, the prosecutor pointed out that O'Toole presented no documentation to corroborate his testimony that he completed sex offender treatment. O'Toole maintains that by inviting the jury to draw an adverse inference from his failure to introduce corroborating evidence of his successful treatment, the prosecutor's closing argument improperly shifted the burden to him to prove his innocence.

¶40    The circuit court properly exercised its discretion in permitting this argument. *See* **State v. Burns**, 2011 WI 22, ¶48, 332 Wis. 2d 730, 798 N.W.2d 166 (the prosecutor is given considerable latitude in closing argument, subject only to the rules of propriety and the circuit court's discretion). O'Toole made his sex offender treatment a relevant fact issue. This allowed the State to challenge the evidentiary support for his testimony. **State v. Patino**, 177 Wis. 2d 348, 381–82, 502 N.W.2d 601 (Ct. App. 1993). *See also* **State v. Saunders**, 2011 WI App 156, ¶¶11–14, 24, 26, 338 Wis. 2d 160, 807 N.W.2d 679 (prosecutor did not shift burden of proof by commenting on the defendant's failure to call a witness, "Paul," who he claimed would have supported his alibi defense).

¶41    O'Toole argues that there is nothing to show the records were "available" to him. *Patino*, 177 Wis. 2d at 382. Presumably, no one had better

access to O'Toole's own sex offender treatment records than he did. Further, in deciding whether to permit the prosecutor to make this argument, the circuit court specifically asked trial counsel if counsel could convince the court "that the records were unavailable to" O'Toole, and counsel answered, "No." It was only after this inquiry that the court ruled that the State could argue that O'Toole's failure to produce the records undercut the credibility of his uncorroborated testimony.

### 2. Prosecutor's Closing Argument Proper Under *State v. Bell*.

¶42    Finally, O'Toole argues that the prosecutor improperly argued in closing that the jury had to choose whether it was the State's witnesses or O'Toole who had lied during their testimony, and that this impermissibly shifted the burden of proof to O'Toole. O'Toole acknowledges that his argument was squarely rejected in *State v. Bell*, 2018 WI 28, 380 Wis. 2d 616, 909 N.W.2d 750. O'Toole believes that *Bell* was wrongly decided and raises the issues in order to preserve it for future review. As O'Toole acknowledges, we are bound to follow *Bell*, and we will not further address this issue. *Cook*, 208 Wis. 2d at 189-90.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.